UNITED STATES of America, Appellee,

v.

Vincent A. THORNE, Appellant.

UNITED STATES of America, Appellee,

v.

Ian A. THORNE, Appellant.

UNITED STATES of America, Appellee,

v.

Antonio PENDER, Appellant.

UNITED STATES of America, Appellee,

v.

Raymond M. HAYNES, Appellant.

Nos. 91–3123, 91–3134, 91–3167 and 91–3184.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 11, 1993.

Decided July 13, 1993.

---

Allen E. Burns, Asst. Federal Public Defender, argued the cause for appellant Raymond M. Haynes. On brief was A.J. Kramer, Federal Public Defender.

Thomas F. Dunn (appointed by this court), argued the cause for appellant Vincent A. Thorne.

Jensen E. Barber (appointed by this court), argued the cause for appellant Ian A. Thorne.

On brief was James T. Maloney (appointed by this court), for appellant Antonio Pender.

Peter H. White, Asst. U.S. Atty., argued the cause for appellee. On brief were Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Elizabeth Trosman and Randall D. Eliason, Asst. U.S. Attys.

Before BUCKLEY, D.H. GINSBURG and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

**KAREN LeCRAFT HENDERSON,** Circuit Judge:

Vincent Thorne, Ian Thorne, Antonio Pender and Raymond Haynes appeal their drug-related convictions. The four defendants challenge the sufficiency of the evidence. They also contend that the district court erred in ruling on several evidentiary matters, including the admission of purported drug ledgers, the failure to appoint a chemist for the defense and the limitation on cross-examination of the government's expert witness. They additionally contend that the police search of the house was invalid because the police violated the federal "knock and announce" statute. Because we find the evidence insufficient to support the charges against Vincent Thorne, we reverse his convictions. We affirm the convictions of the other three defendants.

I.

On September 4, 1990, at approximately 5:00 p.m., Officer Philip Burton of the Metropolitan Police Department established a surveillance post in an unmarked van parked across the street from 3472 14th Street, N.W. During the next two hours, Burton observed lots of activity around the house. A number of people congregated on the front porch. At about 5:30 p.m., Burton witnessed three apparent drug sales conducted by one of the people who had been on the porch. The actual sales took place in a grassy area about a block away from the house.

Approximately fifteen minutes after the transactions, Burton observed Pender, who was on the porch, hand an individual in pink shorts a gym bag. The two of them walked into the house. The individual in pink shorts left the house shortly thereafter. At about 6:15 p.m., Burton observed Haynes on the porch, receiving money from Royce Thomas. Haynes and Thomas then walked along 14th Street and were joined by a third individual. The third individual entered the park with Thomas and gave money to Thomas. They rejoined Haynes and the three then went around to the south side of the house out of Burton's view. At about 6:30 p.m., Haynes, then on the east side of 14th Street, received money from another individual in exchange

for a small plastic bag. Haynes next placed some other small bags in a container. About twenty minutes later, in the park next to the house, Haynes made two drug sales to Officers Robert Arrington, Jr. and Tawana May. Burton also observed these transactions.

Before the sales to the police officers, Officer Burton observed Ian Thorne talking with Keiron Boyce and other people on the front steps of the house. Officer Arrington observed Ian Thorne speaking with Haynes immediately before Haynes sold crack to Officer May. Officer Arrington also saw Ian Thorne pointing, and apparently directing an individual, to the park area where Haynes was selling drugs.

The police arrested Haynes moments after his sales to Officers Arrington and May.[1] While Haynes was being arrested, Officer Burton noticed Pender and another individual pointing toward the police. Pender then walked inside the house. The police, while executing a search warrant, detained Ian and Vincent Thorne, Boyce and several other people in front of the house.[2] Meanwhile, Officer Burton was scanning the area and noticed Pender on the east side of 14th Street wearing a red jacket. As the police walked across the street to interview another individual, Pender began to walk away slowly through a crowd that had gathered. He was looking back at the house and the police officers. After he turned the corner, he continued to walk away very rapidly. The police then arrested him.

During the search of the house, the police found drugs in three different locations: 381 grams of 48% pure crack in a brown paper bag protruding from under a pile of clothes on the top shelf of one of the two closets in one of the second-floor bedrooms, 3.372 grams of 66% pure crack behind the kitchen dryer in the "furnace room" and 2.716 grams of 62% pure crack in a box on the side porch of the house. In the bedroom closet containing the drugs, the police also found an ammunition clip with five live rounds and a brown paper bag with a triple-beam scale. In the other closet, they located a shoe box with a brick of non-narcotic white substance. Underneath one of the beds was a BB gun and a bag filled with ammunition. The dresser in the bedroom contained several documents, including many with Ian Thorne's name on them and addressed to him at 3472 14th Street, N.W., a sales receipt for a car indicating that Pender had made a down payment on a Nissan sports car, at least two documents with Boyce's name on them and a book with Vincent Thorne's name in it. The dresser also contained an address book and a note pad (the ledgers). Each listed Pender's nickname ("Twin") and Haynes's first name ("Raymond")—the former with the names next to numbers that appeared to represent amounts of money and the latter with the names next to what appeared to be telephone and beeper numbers.[3] The police found a number of guns and other drug paraphernalia around the house.

When questioned by the police, Ian and Vincent Thorne and Keiron Boyce indicated that they lived at 3472 14th Street, N.W.[4] When arrested, Ian Thorne was carrying $190, Vincent Thorne was carrying $50 and Pender was carrying $59. The money apparently was not marked. Haynes was carrying $246, including $100 in marked money.

A grand jury indicted Vincent Thorne, Ian Thorne, Pender and Boyce for possessing with intent to distribute in excess of 50

---

1. The drugs Haynes sold consisted of .282 grams of 67% pure crack and .339 grams of 62% pure crack.

2. Ian and Vincent Thorne are brothers; Boyce is their cousin.

3. The address book also listed Boyce's first name next to an apparent beeper number.

4. Clifford Thorne, Ian's and Vincent's father, testified that Ian Thorne spent most of his time at his girlfriend's home but that, when he stayed at 3472 14th Street, N.W., he lived in the bedroom where the crack, the ammunition clip and the scale were discovered. He said that Ian Thorne shared the bedroom with Mark (a third son) and Vincent Thorne and Keiron and Sean Boyce. He testified that Pender, a friend of Ian Thorne, spent considerable time around the house. He also testified that Haynes lived in the basement apartment along with his family but also spent a good deal of time in the Thornes' house above the basement. The basement apartment was not internally connected to the Thornes' quarters upstairs.

grams of cocaine base. It also indicted the four plus Haynes for conspiring to distribute and to possess with intent to distribute in excess of 50 grams of cocaine base. In addition, it indicted Haynes on two counts of distribution.

At trial, Vincent Thorne testified that he returned home at 5:30 p.m. that day and was doing schoolwork until shortly before the police arrived to execute the search warrant. He indicated that he had never seen drugs in the bedroom (where the crack was found) or elsewhere in the house. Boyce likewise testified that he had never seen drugs in the house. Ian Thorne called four witnesses who testified that Sean Boyce, Keiron Boyce's younger brother, admitted that he took the drugs into the house and was holding them for a friend. Haynes and Pender did not present witnesses in their defense.

The jury found the defendants guilty on all counts. The district court denied all motions for judgment of acquittal. It sentenced Vincent Thorne, Ian Thorne and Haynes to 151 months' imprisonment each and Pender to 240 months' imprisonment. Vincent Thorne, Ian Thorne, Pender and Haynes appeal the denial of their motions for judgment of acquittal. Boyce's appeal is not before us.

## II.

### A. *The Ledgers*

Pender and Haynes first challenge the admissibility of the ledgers. As noted, the ledgers found in the dresser in the bedroom listed Pender's nickname and Haynes's first name beside what appeared to be telephone and beeper numbers and money amounts. The appellants argue that the ledgers were not properly authenticated and contained hearsay. We reject both contentions.

■ Rule 901(a) of the Federal Rules of Evidence provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Pender and Haynes contend that the government was required to use handwriting analysis or to identify some other distinctive characteristic in order to authenti-

cate the ledgers and link them to Pender and Haynes. They did not raise this argument at trial, however; therefore we review only for plain error. *See United States v. McGlory,* 968 F.2d 309, 346 n. 24 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1993); *United States v. Papia,* 910 F.2d 1357, 1366 (7th Cir.1990); *United States v. Hawkins,* 905 F.2d 1489, 1494 (11th Cir.1990), *cert. denied,* 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991). To constitute plain error, the error must "rise to the level of error so 'obvious and substantial' or so 'serious and manifest' that it affects the very integrity of the trial process." *United States v. Blackwell,* 694 F.2d 1325, 1341 (D.C.Cir.1982) (citations omitted).

The ledgers were found with documents belonging to the defendants in the bedroom dresser. One of the documents was a sales receipt with Pender's name on it. The other documents contained the Thornes' and Boyce's names. The failure to authenticate the ledgers further through handwriting analysis or otherwise was not plain error.

Their second objection is that the information in the ledgers contained hearsay. Officer Stroud, the government's expert witness, opined that the numbers in the address book signified money amounts from drug transactions and the numbers in the note pad appeared to be phone numbers and beeper numbers. He had earlier testified that beepers are frequently used by drug dealers. Officer Stroud did not specify the names, money amounts or beeper numbers contained in the ledgers. Defense counsel raised a hearsay objection to the testimony.

■ Officer Stroud could permissibly testify that there were names in the ledgers to show that the defendants were connected with each other. *See United States v. Patrick,* 959 F.2d 991, 992–93 (D.C.Cir.1992); *United States v. Helmel,* 769 F.2d 1306, 1313–14 (8th Cir.1985). On the other hand, he did not testify as to the actual money amounts or beeper numbers; those statements might have constituted hearsay had they been used to establish that the numbers were factually accurate money amounts and telephone and beeper numbers.

The more difficult issue is the admissibility of Officer Stroud's testimony that names were listed next to numbers that appeared to be amounts of money and beeper extensions. The jury could have inferred from the testimony that the defendants owned beepers and exchanged money during drug transactions; however, Stroud stopped short of revealing the actual numbers and amounts. In *United States v. Day*, 591 F.2d 861 (D.C.Cir.1978), the government sought to admit information on a slip of paper handed by the decedent shortly before his death to Kerry Mason. The slip stated "Beanny, Eric, 635–3135." *Id.* at 883. The decedent told Mason that if he (the decedent) was not home by a certain time, Mason was to call the police and tell them about a fight the decedent had had with the defendant. We concluded that Mason's testimony as to what the decedent said was inadmissible; however, we held that the slip of paper and its contents were admissible because "[t]he statement is not being offered as proof that Beanny and/or Eric had that telephone number." *Id.* In addition, we noted that "[w]hen statements by an out-of-court declarant which are neutral (not assertive of direct complicity in crime) are offered to show association and not to show the truth of the matters contained therein, and the evidence is not otherwise unfairly prejudicial, the weight of the decided cases allows admission." *Id.* at 883–84.

We relied on *United States v. Ruiz*, 477 F.2d 918 (2d Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973), and *Brown v. United States*, 403 F.2d 489 (5th Cir.1968), *cert. denied*, 397 U.S. 927, 90 S.Ct. 932, 25 L.Ed.2d 106 (1970), to support our position. In *Ruiz*, the Second Circuit affirmed the admission of a slip of paper with the appellant's nickname and telephone number found on an alleged coconspirator's person. The Second Circuit held: "The paper was not introduced to prove the truth or falsity of its contents. It was merely evidence supporting the inference that Torres [the alleged coconspirator] knew Ruiz and anticipated calling him on the telephone." *Ruiz*, 477 F.2d at 919. Similarly, in *Brown*, the Fifth Circuit affirmed the admission of a slip of paper with the name "Ramon" and a telephone number found on the defendant. "[T]he writing on the note was not hearsay, as it was offered to show knowledge by appellant of one 'Ramon' who may or may not have been an associate of the alleged supplier of the drugs." *Day*, 591 F.2d at 884 (citing *Brown*, 403 F.2d at 491).

The information in the ledgers is likewise admissible. Officer Stroud did not indicate the amounts of money or the numbers listed. He did not reveal the names of any defendants. Instead, he testified that there were names next to what, in his opinion, were beeper and telephone numbers and money amounts. From this evidence the jury could conclude that the names were connected to the telephone and beeper numbers and money amounts. The evidence was not hearsay and, accordingly, the district court did not err in admitting it.

### B. *Motions for Judgment of Acquittal*

In reversing the denial of a motion for judgment of acquittal, we "view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the jury to determine the weight and the credibility of the evidence." *United States v. Sutton*, 801 F.2d 1346, 1358 (D.C.Cir.1986). The government is "not required to disprove every conceivable scenario in which appellant would be innocent"; instead, a defendant "is entitled to a judgment of acquittal 'only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Whetzel*, 589 F.2d 707, 710–11 (D.C.Cir.1978) (quoting *United States v. Davis*, 562 F.2d 681, 683 (D.C.Cir.1977)). We must "affirm the judgment if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Long*, 905 F.2d 1572, 1576 (D.C.Cir.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied*, 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990).

Vincent Thorne, Ian Thorne and Pender assert that there was insufficient evi-

dence to support their convictions of possession with intent to distribute. Possession may be "actual" or "constructive." Constructive possession "may be shown through evidence that a person knowingly was in a position to exercise dominion and control over the contraband." *United States v. Morgan,* 914 F.2d 272, 275 (D.C.Cir.1990). "[T]he critical inquiry is whether the factfinder can reasonably conclude from the proof that the accused likely had some appreciable ability to guide the destiny of the drug." *United States v. Staten,* 581 F.2d 878, 883 (D.C.Cir.1978). We have repeatedly held that "[m]ere presence of the accused on the premises, or simply his proximity to the drug, does not itself" establish constructive possession. *Id.* at 884. "Nor is mere association with another, standing alone, enough even when the other is known to possess the drug." *Id.* In other words, "[t]here must be some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them." *United States v. Pardo,* 636 F.2d 535, 549 (D.C.Cir.1980).

### 1. *Vincent Thorne*

■ There was insufficient evidence to convict Vincent Thorne of possession with intent to distribute. The government relied on the following evidence to establish Vincent Thorne's constructive possession: He lived in the bedroom where most of the drugs and some of the drug paraphernalia were found and he had $50 on his person when he was arrested. But Vincent Thorne shared the bedroom with at least four other people at various times. Moreover, none of the drugs or drug paraphernalia in the bedroom was in plain view. The drugs in the closet were in a brown paper bag under a pile of clothes and the triple-beam scale was also in a brown paper bag. The brick of non-narcotic white substance found in the other bedroom closet was in a shoe box. His name did not appear in the ledgers. In addition, there was evidence that Vincent Thorne kept most of his belongings in another bedroom, lessening the likelihood that he used the closets in the bedroom where the drugs and drug paraphernalia were found.

The Third Circuit reversed a possession conviction on facts similar to Vincent Thorne's. In *United States v. Bonham,* 477 F.2d 1137 (3d Cir.1973) (en banc), the police discovered heroin hidden in a recess above a bedroom door behind the door frame. Two people shared the bedroom. The Third Circuit stated:

> Here there was nothing except the joint occupancy of the room upon which an inference of possession could be based. A fact finder could only speculate whether both of the room's occupants or a particular one of them even knew of the cache, much less exercised control over the hidden contraband.

*Id.* at 1139. The court distinguished the facts in *Bonham* from a situation where drugs are in plain view or where there is only one occupant who presumably controls the contents of the room.

Two of our decisions distinguishing *Bonham* underscore the need for more than mere presence to establish constructive possession. In *United States v. Davis,* 562 F.2d 681, 685 (D.C.Cir.1977), the defendant, who shared the apartment with two other occupants, was found "in the very middle of all the drugs and paraphernalia, much of it in plain view and easily accessible to him." In contrast to *Bonham,* the drugs "were *in view* sufficiently to indicate that appellant knew about the contraband and hence could be found to be in possession of the hidden drug." *Id.* at 692 (emphasis in original). Likewise, in *United States v. James,* 764 F.2d 885 (D.C.Cir.1985), we distinguished *Bonham* because it was a case "devoid of *any* evidence that pointed to possession by the defendant." *Id.* at 890 (emphasis in original). In *James,* the defendant was found in a basement bedroom where someone had tried to wash drugs down the sink. Moreover, after his arrest he dressed himself with clothes from a rack containing two jackets in the defendant's size. The jackets contained drugs. Finally, a small room with drug paraphernalia in plain view was located just a short distance from the defendant's bed.

In *United States v. Green,* 652 F.Supp. 1312 (D.D.C.1987), the district court granted a motion for judgment of acquittal in similar

circumstances. When the police executed the search warrant, three people were in the apartment (one was an infant). The police found drugs in two locations and bundles of money in a third. The drugs and money were well-hidden. Five defendants used the apartment as a mailing address. In addition, a witness testified that the son of one of the defendants had shown him the drugs two days before the search and arrest. The district court concluded:

> In order to convict defendants, the jury would have had to infer knowing dominion and control from the mere discovery of contraband in an apartment shared with at least four others. There was no evidence of any contraband or drug paraphernalia in plain view. Indeed, the items seized were only discovered after a thorough search, in one case beneath several layers of clothing and magazines, and in another after opening a bottle and sniffing its contents. Such an inference is impermissible as a matter of law.
>
> The testimony of the defense witness that a juvenile resident of the searched premises showed the witness the PCP makes this inference still more improper, since it strongly suggests that someone other than defendants had knowing dominion and control of the seized narcotics.

*Id.* at 1315.

The government argues that Vincent Thorne's testimony that he had no knowledge of any drugs in the house points to his guilt. By convicting him, the jury necessarily concluded that he had lied. "In theory, [such] testimony could have satisfied the jury not only that [the defendant] was lying, but also that the truth was the opposite of what [he] claimed." *United States v. Jenkins*, 928 F.2d 1175, 1178 (D.C.Cir.1991). In *United States v. Zeigler*, 994 F.2d 845, 849–50 (D.C.Circuit 1993), we substantially curtailed the use of negative inference evidence to sustain a criminal conviction:

> Because we cannot evaluate demeanor, a decision along the lines the government proposes would mean that in cases in which defendants testify, the evidence invariably would be sufficient to sustain the conviction. We would in each such case

assume the jury correctly evaluated the evidence. In explaining how this could be so in light of the defects in the government's proof, we would reason backwards to the only explanation available—the defendant's demeanor. This sort of approach, beginning with the hypothesis that the jury must have gotten things right, contradicts the reason why appellate courts review convictions for sufficiency of evidence—that juries sometimes get things wrong.

*Id.* at 849. Thus, "[t]here is no principled way of deciding when the government's proof, less than enough to sustain conviction, is nevertheless enough to allow adding negative inferences from the defendant's testimony to fill the gaps." *Id.* at 850.

We pointed out in *Zeigler*, however, that "[t]he situation would be different if the defendant's testimony, on its face, were utterly inconsistent, incoherent, contradictory or implausible." *Id.* at 849. At most, Vincent Thorne's testimony that he did not know about the drugs is implausible. Nevertheless, knowledge alone does not establish even constructive possession; the government must also prove the ability to exercise dominion and control over the drugs. *Morgan*, 914 F.2d at 275. Accordingly, we reverse Vincent Thorne's conviction on the possession count.

### 2. *Ian Thorne*

Ian Thorne stayed in the bedroom where the drugs were found and kept important documents there, including an envelope from a beeper company with his name on it. Ian Thorne gave 3742 14th Street, N.W. as his home address. More important, Ian Thorne had been talking with people on the front porch, including Haynes, moments before he sold drugs to two officers and had directed one person to the area of the park where Haynes was selling drugs.

On the other hand, Ian Thorne emphasizes that he normally lived with his girlfriend and that he did not keep items essential to daily life at the house. He also notes that his name was not in the drug ledgers.

The government produced sufficient evidence to establish that Ian Thorne had constructive possession of the drugs. His conduct on the porch, including directing the customer to the park where the drugs could be bought, allowed the jury reasonably to conclude that he knew about, and had an interest in the distribution of the drugs, which also strongly indicates that they were under his control. "[E]vidence of some other factor—including . . . a gesture implying control, or a statement indicating involvement in an enterprise—coupled with proximity surpass the minimum threshold of evidence needed to put the question of guilt to a jury." *United States v. Gibbs*, 904 F.2d 52, 56 (D.C.Cir.1990). In addition, when Ian Thorne stayed at the house, he stayed in the bedroom where most of the drugs were found. Finally, there was evidence that he owned a beeper.

### 3. *Antonio Pender*

Clifford Thorne, Ian's and Vincent's father, testified that Pender did not live in the house and did not visit the bedroom often. Nevertheless, Pender listed the house as his address when he applied for a driving permit. He was a frequent visitor to the house and apparently had access to all parts of the house. A sales receipt for a car Pender purchased was found in the bedroom with the drugs and his nickname appeared in the ledgers. Officer Burton had observed Pender handing an unidentified individual a gym bag and then entering the house with that individual. More important, Pender attempted to flee the scene when the police searched the house. He walked away while looking back at the officers and the house and then walked "very rapidly" after he believed he was out of sight. The "evasive conduct," *Gibbs*, 904 F.2d at 56, coupled with the other evidence, constitutes sufficient evidence for us to uphold Pender's possession conviction.

### C. *Conspiracy*

The jury also convicted the four appellants of conspiracy to distribute or possess with intent to distribute.[5] Each challenges the sufficiency of the evidence. The government stipulated that the overt acts of the conspiracy occurred between 5:00 p.m. and 7:00 p.m. on September 4, 1990. To establish that a defendant conspired to distribute, the government must show that there was an agreement between two or more persons to distribute and that the defendant was a knowing participant in the agreement. *See United States v. Pumphrey*, 831 F.2d 307 (D.C.Cir.1987); *United States v. Collins*, 966 F.2d 1214 (7th Cir.1992). The government does not need to prove an overt act. *Pumphrey*, 831 F.2d at 308. A jury may infer the existence of agreement through circumstantial evidence. *United States v. Morris*, 836 F.2d 1371, 1373 (D.C.Cir.1988).

The evidence was sufficient to demonstrate a conspiracy among Ian Thorne, Pender and Haynes, but it was insufficient to show Vincent Thorne's involvement. Ian Thorne and Pender had access to the bedroom where most of the drugs were found. Ian Thorne was seen directing someone toward the park moments before Haynes made a sale there. The three defendants were observed on the porch at various times talking with each other. Pender's and Haynes's names were in the ledgers. Finally, the purity of the drugs sold by Haynes was almost identical to the purity of the drugs found in the furnace room and on the side porch of the house.[6] This evidence was sufficient for a jury to conclude that the three were knowingly acting together in agreement to distribute drugs.

By contrast, there was no evidence indicating that Vincent Thorne was a knowing participant in any agreement. Vincent Thorne may have known about the drugs in the house but his name was not in the ledg-

---

5. Haynes challenges only his conspiracy conviction. He does not appeal his convictions on two counts of distribution.

6. As noted earlier, Haynes sold .282 grams of 67% pure crack and .339 grams of 62% pure

crack to the undercover police officers, 3.372 grams of 66% pure crack were found behind the kitchen dryer in the "furnace room" and 2.716 grams of 62% pure crack were found in a box on the side porch of the house.

ers, he was not seen directing any buyers and he did not attempt to flee. Although an overt act is not necessary to participate in a conspiracy, the government did not establish Vincent Thorne's knowing participation in an agreement to distribute drugs. Accordingly, we reverse Vincent Thorne's conviction on the conspiracy count.

### D. *Miscellaneous Issues*

The other issues raised by the appellants are without merit. Haynes contends that the court erred in not appointing a defense chemist. Haynes did not raise the objection at trial and therefore waived it. *See* Fed.R.Crim.P. 12(f). Even if he had objected, Haynes has failed to show by clear and convincing evidence that he was prejudiced by the district court's decision. *See United States v. Brewer*, 783 F.2d 841, 843 (9th Cir.) (failure to appoint expert on eyewitness identification not error where no showing of actual prejudice), *cert. denied*, 479 U.S. 831, 107 S.Ct. 118, 93 L.Ed.2d 64 (1986).

The district court limited cross-examination of Officer Stroud on the issue of the difference in purities between the drugs in the house and the drugs sold by Haynes on the street. During direct examination, the government asked about the differences in purity and Haynes's counsel objected. The district court sustained the objection. On cross-examination, Haynes's counsel asked a similar question. The government then objected and the district court sustained the objection. We have often stated that "[t]he district court enjoys wide discretion to control cross-examination." *Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 935 (D.C.Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992). We will reverse the district court's decision to limit cross-examination only if it "results in prejudice to the substantial rights of the appellant." *Id.* The district court's ruling did not substantially prejudice the defendants because they were able to, and did, elicit through other questions that different purities might mean different drug stashes.

Finally, Ian Thorne contends that the police violated the federal "knock and announce" statute. The statute provides: "The officer may break open any outer or inner door or window of a house ... to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance." 18 U.S.C. § 3109. According to Ian Thorne, the officer did not announce his purpose before forcing the front door open. The testimony of the entering officer, however, indicated that the door was ajar and he could see into the house. Nevertheless, he knocked twice and the force of the knocks further opened the door. Because the officer did not break open the door, he did not violate the statute. *See United States v. Patrick*, 959 F.2d 991, 998–99 (D.C.Cir.1992); *White v. United States*, 346 F.2d 800, 802–03 (D.C.Cir.1965), *cert. denied*, 382 U.S. 1014, 86 S.Ct. 625, 15 L.Ed.2d 529 (1966).

For the foregoing reasons, we reverse Vincent Thorne's convictions and affirm the convictions of Ian Thorne, Antonio Pender and Raymond Haynes.

*It is so ordered.*