16 F.3d 1226
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
James PUGH, Defendant-Appellant.
 No. 93-1878.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 26, 1994.
Decided Feb. 14, 1994.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 92 CR 567; James F. Holderman, Judge.
 N.D.Ill.
 AFFIRMED.
 Before ESCHBACH, RIPPLE and MANION, Circuit Judges.
 
 ORDER
 
 1
 After a bench trial, James Pugh was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. Sec. 922(g)(1), and sentenced to five years imprisonment. We affirm.
 
 
 2
 On July 8, 1992, a federal grand jury returned a one-count indictment against James Pugh, charging him with violating 18 U.S.C. Sec. 922(g)(1). The indictment specified that Mr. Pugh possessed a 9-millimeter submachine gun "[i]n or about late July, 1987." At Mr. Pugh's trial, government witness William Coffelt testified that on June 27, 1987, he gave Mr. Pugh the machine gun in exchange for Mr. Pugh's assistance in obtaining a stolen Chevrolet Camaro. John H. Rotunno, a special agent with the Bureau of Alcohol, Tobacco and Firearms (the "ATF"), who also appeared as a government witness, testified that the submachine gun was confiscated on August 7, 1987, by the Kankakee Police Department from a trailer owned by Chris Connelley. On October 7, 1988, Agent Rotunno and ATF Agent Wido met with Mr. Pugh at his own request. Mr. Pugh explained how he came into possession of the submachine gun, and stated that both he and Mr. Connolley owned the gun. Mr. Pugh also told the agents that after he had learned of Mr. Connolley's arrest, he immediately tried to find out what had happened to the gun.
 
 
 3
 On July 9, 1992, ATF Agents Rotunno and Ray Dowling arrested Mr. Pugh. Agent Rotunno informed Mr. Pugh of the charge against him, and advised him of his Fifth Amendment rights under Miranda. Mr. Pugh was then taken to the ATF office, where he signed a written waiver of his Miranda rights. Agents Rotunno and Dowling interviewed Mr. Pugh for approximately fifteen to twenty minutes. At the end of the initial interrogation, Agent Rotunno left to respond to a radio call. Approximately ten minutes later, he returned to his desk, placed a cassette tape in a hidden tape recorder, and began a second interview of Mr. Pugh. He did not advise Mr. Pugh that the second interview was being tape-recorded, nor did he repeat the Miranda warnings to Mr. Pugh. During the second interview, Mr. Pugh stated that he and Mr. Connolley were "part owners" of the machine gun, but that Mr. Connolley usually held the gun for safekeeping. He further stated that the gun had been in his basement on August 6, 1987, the night before it was confiscated.
 
 
 4
 Mr. Pugh contends that because he was not informed that his second interrogation would be tape-recorded, his relinquishment of his Fifth Amendment right against self-incrimination was ineffective. Miranda v. Arizona, 384 U.S. 436 (1966). The Supreme Court's holding in Moran v. Burbine, 475 U.S. 412 (1986), forecloses this argument. Under Burbine, although government agents are required to advise a suspect of the rights he would be waiving if he consented to talk to them, they need not "supply the suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak." Id. at 422. Prior to his interrogation, the agents fully advised Mr. Pugh that any statement he may make would be used against him to obtain his conviction. See Miranda, 384 U.S. at 468-70. They were under no additional obligation to advise him of the means by which his statement would be preserved for trial.[1] See Burbine, 475 U.S. at 422-23.
 
 
 5
 Mr. Pugh argues that the evidence was insufficient to prove that he constructively possessed the submachine gun on or after July 7, 1987.[2] In evaluating a challenge to the sufficiency of the evidence, the test is whether, "after viewing the evidence in the light most favorable to the prosecution, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. DePriest, 6 F.3d 1201, 1206 (7th Cir.1993) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis supplied by Jackson court).
 
 
 6
 Constructive possession of contraband "is established when the evidence sufficiently demonstrates ownership, dominion, or control." United States v. Hernandez, No. 93-1996, slip op. at 5 (7th Cir. Jan. 3, 1994). Constructive possession exists when "a person ... knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." United States v. Garrett, 903 F.2d 1105, 1110 (7th Cir.) (internal quotations, citations omitted), cert. denied, 498 U.S. 905 (1990). Although "the exercise of control need not be exclusive, ... where [that] possession is not exclusive, there must be a nexus between the accused and the contraband." Hernandez, No. 93-1996, slip op. at 5.
 
 
 7
 Where a residence is jointly occupied, the fact that a firearm was present at the residence will not, standing alone, support an inference of constructive possession. See United States v. Thorne, 997 F.2d 1504, 1510 (D.C.Cir.), cert. denied, 114 S.Ct. 568 (1993); United States v. Ford, 993 F.2d 249, 252 (D.C.Cir.1993). In this case, there was much more than the mere presence of the firearm at Mr. Pugh's residence to establish constructive possession. On June 27, 1987, Mr. Pugh received the submachine gun from Mr. Coffelt in exchange for arranging the theft and delivery of a Camaro. When Mr. Pugh gave the gun to Mr. Connolley for safekeeping, he continued to assert ownership over it. See Hernandez, No. 93-1996, slip op. at 5; Thorne, 997 F.2d at 1510; Ford, 993 F.2d at 252. Indeed, upon learning of Mr. Connolley's August 7, 1987 arrest, Mr. Pugh immediately tried to find out if the gun had been confiscated, thus showing that he had a stake in the weapon. See Ford, 993 F.2d at 252. The tape-recording and transcript of Mr. Pugh's interrogation by the ATF agents establishes that the gun was in the basement of Mr. Pugh's apartment building on August 6, 1987, and that Mr. Pugh "knowingly was in a position or had the right to exercise dominion or control over the item" at that time. Id. The admissible evidence is sufficient to meet the standard for finding constructive possession as explained in Garrett, 903 F.2d at 1110-11 & nn. 4-5.
 
 
 8
 Because we conclude that the tape-recorded interrogation of Mr. Pugh was properly admitted into evidence, and that the evidence was sufficient to prove that Mr. Pugh violated 18 U.S.C. Sec. 922(g)(1), we
 
 
 9
 AFFIRM.
 
 
 
 [1]
 Mr. Pugh's reliance on Connecticut v. Barrett, 479 U.S. 523 (1987), is also misplaced. Unlike the defendant in Barrett, Mr. Pugh never indicated that he desired to limit the waiver of his Fifth Amendment rights or to consult an attorney before memorializing his statement in any particular way. See id. at 529-30 & n. 2
 
 
 [2]
 The government concedes that in light of the five-year statute of limitations period governing violations of 18 U.S.C. Sec. 922(g)(1), it was required to prove constructive possession during that time frame. See 18 U.S.C. Sec. 3282