**UNITED STATES of America**

v.

**Raymond N. HAYNES, Defendant.**

**Cr. A. No. 90–00422–5 (CRR).**

United States District Court, District of Columbia.

Nov. 30, 1995.

John M. Facciola, Assistant United States Attorney, Washington, DC, with whom Eric H. Holder, United States Attorney for the District of Columbia, was on the briefs, for the Government.

Allen E. Burns, Assistant Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, Washington, DC, was on the briefs, for Defendant.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

The Court must determine the amount of drugs properly attributable to the defendant as relevant conduct for the purpose of calculating the base offense level for his sentence. Upon careful consideration of the parties' pleadings, the testimony taken at the November 3, 1995 hearing, the arguments at the November 27, 1995 hearing, the entire record herein, and the law applicable thereto, the Court concludes that 16.939 grams of cocaine base are attributable to the defendant by virtue of his membership and participation in the conspiracy of which he was convicted, warranting a base offense level of 26.

## I. BACKGROUND

On January 28, 1991, the defendant was convicted by a jury of one count of conspiracy to distribute and to possess with intent to distribute cocaine base, as well as two counts of distributing cocaine base. Four codefendants in the case were convicted of that same conspiracy; in addition, they were convicted of possession with intent to distribute cocaine base—a crime for which the defendant was not charged. The defendant's convictions were affirmed by the Court of Appeals. *See United States v. Thorne*, 997 F.2d 1504, 1513 (D.C.Cir.1993).

The circumstances of the defendant's arrest, conviction, and sentencing are as follows: On September 4, 1990, at about 5:00 p.m., Officer Philip Burton of the District of Columbia Metropolitan Police Department established a surveillance post in an unmarked van parked across the street from 3472 14th Street, N.W.. *Id.* at 1506. During the course of the next two hours, Burton observed a good deal of activity around the house. *Id.* A number of people congregated on the front porch and, at about 5:30 p.m., Burton witnessed three apparent drug sales by one of the people who had been on the porch; the sales took place in a grassy park area approximately a block away from the house. *Id.*

Roughly fifteen minutes after the transactions, Burton observed co-defendant Antonio Pender, who was on the porch, hand an individual a gym bag. *Id.* Some thirty minutes later, Burton observed defendant Haynes on the porch, receiving money from Royce Thomas. *Id.* Haynes and Thomas then walked along 14th Street and were joined by a third individual. *Id.* The third individual entered the park with Thomas whereupon he gave money to Thomas. *Id.* The two rejoined Haynes and the three then went around to the south side of the house out of Burton's view. *Id.*

Approximately fifteen minutes later, Haynes, then on the east side of 14th Street, received money from another individual in exchange for a small plastic bag. *Id.* at 1506-07. After placing some other small bags in a container, and about twenty minutes later, Haynes made two drug sales to Officers Robert Arrington, Jr. and Tawana May consisting of .282 grams of 67% pure cocaine base and .339 grams of 62% pure cocaine base, respectively; Burton also observed these transactions. *Id.* at 1507 & n. 1.

Prior to the sales to the undercover officers, Burton observed co-defendant Ian Thorne talking with co-defendant Keiron

Boyce among others on the front steps of the house. *Id.* at 1507. Officer Arrington, in turn, observed Ian Thorne speaking with Haynes immediately before Haynes sold crack to Officer May. *Id.* Officer Arrington also saw Ian Thorne pointing, and apparently directing an individual, to the park where Haynes was selling drugs. *Id.* The police arrested Haynes moments after his sales to Officer Arrington and May. *Id.* While Haynes was being arrested, Officer Burton observed Pender and another individual pointing toward the police. *Id.* Pender then walked inside the house. *Id.* The police, while executing a search warrant, detained Ian and Vincent Thorne (Ian's brother), Boyce (the Thorne's cousin), and several other people in front of the house. *Id.* Meanwhile, Burton noticed Pender on the east side of 14th Street wearing a red jacket. *Id.* As the police walked across the street to interview another individual, Pender began to slowly walk away through a crowd that had gathered while looking back at the house and the police officers. *Id.* After he turned the corner, he began to walk more rapidly. *Id.* The police then arrested him. *Id.* When arrested, Pender was carrying $59, Ian Thorne was carrying $190, Vincent Thorne was carrying $50. *Id.* Haynes was carrying $246, including $100 in marked money. *Id.*

During the search of the house, the police found drugs in three different locations: 381 grams of 48% pure crack in a brown paper bag protruding from under a pile of clothes on the top shelf of one of the two closets in one of the second-floor bedrooms, 3.372 grams of 66% pure crack behind the kitchen dryer in the "furnace room" and 2.716 grams of 62% pure crack in a box on the side porch of the house. *Id.* In the bedroom closet containing the drugs, the police also found an ammunition clip with five live rounds of and a brown paper bag with a triple-beam scale. *Id.* In the other closet, they located a shoe box with a brick of non-narcotic white substance while underneath one of the beds was

a BB gun and a bag filled with ammunition. *Id.*

A dresser in the bedroom contained several documents, including many with Ian Thorne's name on them and addressed to him at the house, a sales receipt indicating that Pender had made a down payment on a sports car, at least two documents with Boyce's name on them, and a book with Vincent Thorne's name in it. *Id.* The dresser also contained two ledgers—an address book and a note pad—each listing Pender's nickname ("Twin") and Haynes's first name ("Raymond"). The address book listed the names, in addition to Boyce's first name, next to numbers that appeared to represent amounts of money; the note pad listed the names next to what appeared to be telephone and beeper numbers.[1] *Id.*

Upon questioning by the police, Ian and Vincent Thorne and Boyce indicated that they lived at the house. *Id.* The Thornes' father testified at trial that Ian shared the upstairs bedroom with Mark Thorne (a third son), Vincent, Keiron, and Boyce. *Id.* at n. 4. The father also testified that Haynes lived in the basement apartment along with his family but also frequently spent time in the Thornes' house above the basement; the basement apartment was not internally connected to the Thornes' quarters upstairs. *Id.* At the November 3, 1995 hearing, Haynes testified that he regularly played Nintendo computer games with the co-defendants in the upstairs bedroom but that he never saw any of the contraband found therein.

Sentencing occurred in May 1991. The defendant's Presentence Investigation Report ("PSI") set forth the following findings:

> [Par. 12] The 7 ziplock bags found in the furnace room next to the kitchen contained 3.372 grams of cocaine base. The 9 plastic baggies found in the defendant's bedroom contained approximately 381.1 grams of cocaine base. The 7 ziplock bags found in a box on the side porch contained approxi-

---

1. A beeper company representative testified at trial that Pender had purchased a beeper from his company with the phone number 214–5071, the number which appeared in the note pad next to "Twin." The representative also testified the telephone company exclusively assigns to his

company certain phone prefixes and numbers including those beginning with a "214" prefix and numbers between 719–8000 and 719–8999; in the book next to the name "Raymond" are the numerals "719–8569."

mately 2.716 grams of cocaine base. As stated previously, Raymond Haynes sold 0.339 grams of cocaine base to one undercover officer and 0.282 grams to another undercover officer. The total amount of drugs involved in this offense was 384.5 grams of cocaine base. This amount of cocaine has an approximate street value of $40,000.

[Par. 20] Base Offense Level: The Guideline for 21 U.S.C. 846 and 841(a) and (b)(1)(C) and (b)(1)(A)(iii) is found in Sections 2D1.4 and 2D1.1(c)(5). Those sections provide that conspiracy and unlawful trafficking of 384.5 grams of cocaine base have a base offense level of 34.

[Par. 36] Guideline Provisions: Based on a total offense level of 34 and a criminal history category of I, the guideline imprisonment range is 151 to 188 months.

■ During the sentencing proceeding, counsel for the defendant did not dispute the PSI finding that the quantity of cocaine base involved in the conspiracy warranted a base offense level of 34. The Court subsequently adopted the findings of fact and conclusions of law set forth in the PSI and imposed the minimum Guideline sentence of 151 months. However, neither the sentencing transcript nor the PSI indicates that the necessary individualized findings were made linking the defendant's participation in the conspiracy with the quantum of drugs attributed to him. *See United States v. Edmond,* 52 F.3d 1080, 1105 (D.C.Cir.1995). As the Court of Appeals has made clear, the mere adoption of findings in a PSI is insufficient to satisfy the requirement that the Court explicitly analyze the scope of the defendant's conspiratorial agreement in order to determine the amount of drugs for which he might be deemed responsible. *Id.; United States v. Saro,* 24 F.3d 283, 288–290 (D.C.Cir.1994). Therefore, it is incumbent upon the Court to determine the amount of drugs attributable to the defendant by virtue of his membership and participation in the conspiracy.

## II. DISCUSSION

### A. The current version of U.S.S.G. § 1B1.3 governs resentencing.

■ As a threshold matter, resentencing is governed by the Sentencing Guidelines in effect on the date of resentencing, unless this would result in a harsher sentence and *ex post facto* violation. U.S.S.G. § 1B1.11; *United States v. Clark,* 8 F.3d 839, 844 (D.C.Cir.1993). Because the current relevant conduct Guideline, U.S.S.G. § 1B1.3, does not materially differ in its application from that in effect at the time of the defendant's sentencing the current version shall govern the defendant's resentencing.

Section 2D1.4(A) of the Guidelines in effect at the time of the defendant's sentencing, upon which the Probation Officer relied in completing the defendant's PSI, cross-references § 1B1.3 which, in turn, provides:

> Unless otherwise specified ... cross-references in Chapter Two ... shall be determined on the basis of ... all acts or omissions committed or aided or abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the offense of conviction....

U.S.S.G. § 1B1.3(a)(1). Application Note 1 further explains:

> Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in the defendant's offense level under this guideline.

U.S.S.G. § 1B1.3, Application Note 1.

■ The relevant conduct Guideline, § 1B1.3, and its commentary and examples were revised, effective November 1, 1992. Thereunder, with respect to jointly undertaken criminal activity, a defendant is liable for the conduct of others only if it "was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that activity." U.S.S.G. § 1B1.3, Application Note 2. Thus, in fixing conspiratorial liability on a defendant, a court must first determine the scope of the defendant's agreement with his or her co-conspirators, and then determine whether the distribution of the contraband at issue was within the scope and in furtherance of

that agreement. Because the attribution of co-conspiratorial conduct under the current § 1B1.3 does not differ from that under the Guidelines in effect at the time of the defendant's sentencing, it cannot be said that the application of § 1B1.3, as revised, will result in a harsher sentence and *ex post facto* violation. Accordingly, the defendant's resentencing will be governed by the current version of § 1B1.3.

**B. 16.939 grams of cocaine base are attributable to the defendant as relevant conduct.**

 Given the defendant's conviction for conspiracy to possess a controlled substance with the intent to distribute, the amount of drugs used to calculate his base offense level includes (i) the drugs the defendant sold or possessed on his person, and (ii) all the drugs the defendant could reasonably foresee would be possessed by himself or others that "his agreed upon participation would involve." *United States v. Anderson*, 39 F.3d 331, 353 (D.C.Cir.1994). If the evidence establishes the existence of a single conspiracy, as the court concludes it does here, the issue is whether the evidence preponderates in favor of the proposition that, on the basis of the defendant's agreement to participate in the conspiracy, it was reasonable for him to foresee that one or more of his co-conspirators would possess the drugs the police seized and which the Government argues should be used in calculating his base offense level. *Id.*

**1. The drugs the defendant sold to the undercover officers and to an unidentified individual on September 4, 1990.**

 The amounts the defendant sold to the undercover officers in two $50 bags were .282 gram of 67% pure cocaine base and .339 gram of 62% pure cocaine base. *Thorne*, 997 F.2d at 1507 n. 1. These amounts, totaling .621 grams, are clearly attributable to the defendant.

 The defendant was also observed making another sale on September 4, 1990, and at sentencing and the November 3, 1995 hearing, he admitted making this sale. Because it was not a controlled sale, the amount of drugs that were sold to the unidentified

individual must be estimated; such estimates should, in turn, "err on the side of caution." *United States v. Sepulveda*, 15 F.3d 1161, 1198 (1st Cir.1993); *United States v. Sims*, 975 F.2d 1225, 1243 (6th Cir.1992); *see United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir.1993) ("The need to estimate … is not a license to guesswork"). The average weight of two bags sold to the undercover officers was .31 grams and, although averages are not always reliable, *see Sepulveda*, 15 F.3d at 1198–1199, it is reasonable to estimate that the third bag, which was sold contemporaneously with the other two, weighed that amount. Accordingly, an additional .31 gram is attributable to the defendant by virtue of the sale to the unidentified individual on September 4, 1990.

**2. The drugs found on the side porch.**

The defendant acknowledges that the drugs found on the side porch, seven bags located in a box totaling 2.716 grams of 62% pure cocaine base, constituted his personal stash. *Id.* at 1507. This amount is clearly attributable to the defendant.

**3. The drugs in the furnace room.**

The defendant, while disavowing responsibility for the seven bags of 66% pure cocaine base totaling 3.372 grams found in the furnace room next to the kitchen in his pleadings, conceded responsibility therefor at the November 27, 1995 hearing. The defendant's concession is buttressed by the similar packaging and purity of those drugs to those the defendant sold to the undercover officers and those located on the side porch. Accordingly, an additional 3.372 grams is attributable to the defendant.

**4. The drugs the defendant admits previously having sold.**

 Drugs the defendant admits to having sold earlier, as part of the same course of conduct as the September 4, 1990 sales are also attributable to him as relevant conduct under U.S.S.G. § 1B1.3(a)(2). In his presentence interview, the defendant admitted that during the month prior to the September 4, 1990 sales he sold $200 worth of drugs twice a week. At the November 3, 1995 hearing, the defendant indicated that he did not know

the weight of the drugs he sold, but that they were sold in $20 bags. Given the known average weight of the $50 bags, a reasonable estimate of the weight of the $20 bags can be drawn therefrom.

The Government does not dispute the defendant's assumption that a $20 bag contains no more than ⅖ or 40% of the amount of cocaine base in a $50 bag. Neither does the Court. Therefore, if the average $50 bag involved in this conspiracy, as noted earlier, weighed .31 gram, it can be inferred that the average $20 bag weighed no more than 40% of .31 gram, or .124 gram. If the defendant sold 10 bags twice a week for the four weeks of August, 1990, it can then be inferred that he sold a total of 9.92 grams. Accordingly, the Court attributes that amount to the defendant.

### 5. The drugs in the upstairs bedroom closet.

In light of the substantial dissimilarity between the 381 grams found in the upstairs bedroom closet and the other drugs involved in the conspiracy, and the lack of evidence indicating that the distribution of the larger amount was within the scope of the defendant's agreement with his co-conspirators, the Court concludes that the evidence does not preponderate in favor of attributing the 381 grams to the defendant.

Arguing that the house constituted a staging area for the conspiracy where the drugs were stored and packaged for distribution, the Government maintains that the scope of the defendant's agreement with his co-conspirators was to distribute all of the narcotics located therein. In support of its argument, the Government points to the triple beam scale and glassine envelopes found in the upstairs bedroom as evidence that the house served as a manufacturing and distribution center for the conspiracy. The failure to infer that "the defendant could have reasonably foreseen that there were additional drugs in the house," the Government asserts, will rob the jury's finding of conspiracy of all significance in the defendant's sentencing. Government's Reply Memorandum, at 2.

The gravamen of the defendant's claim is that there is no evidence connecting him with the 381 grams found in the upstairs closet.

Accordingly, he maintains that, under § 1B1.3, those drugs should be excluded from the calculation of his base offense level.

As an initial matter, the Guidelines clearly contemplate that criminal liability and sentencing liability are not coextensive: Application Note 1 to the relevant conduct Guideline notes that "[t]he principles and limits of sentencing accountability are not always the same as the principles and limits of criminal liability." U.S.S.G. § 1B1.3, Application Note 1. Thus, while a defendant need not necessarily know the *exact* amount of drugs involved in criminal activity in order to be held responsible for the entire amount, *see United States v. De La Cruz*, 996 F.2d 1307, 1314 (1st Cir.1993), the Court is required to make specific findings as to the quantity of drugs that were reasonably foreseeable to each defendant. *See Anderson*, 39 F.3d at 353 (remanding for "specific, individualized findings regarding the quantity of drugs each appellant might have reasonably foreseen his or her agreed upon participation would involve"); *United States v. Rogers*, 982 F.2d 1241, 1246 (8th Cir.1993) (remanding finding that "by virtue of the conspiracy conviction" drug sales attributed to codefendant are also attributable to defendant as an insufficient statement of reasons to support attribution). While the Court rejects the defendant's theory of the conspiracy in favor of the Government's, it cannot conclude that the distribution of the drugs in the bedroom closet was within the scope of the defendant' agreement with his co-conspirators.

The two theories propounded by the parties are mutually exclusive. Therefore, a necessary implication of the Court's acceptance of the Government's theory of the case is the rejection of the defendant's theory of a hub and spoke conspiracy whereby he and the Thornes each received their respective supply from someone named Eddie. The Court finds the defendant's contention without merit in light of the overwhelming evidence that the distribution of drugs from the house was a cooperative endeavor between the defendant and his co-conspirators. This conclusion is consistent with the furtive activ-

ity the police observed prior to the defendant's arrest indicating that prospective purchasers were directed by the defendant's co-conspirators from the house to the park where they would then undertake to purchase drugs from the defendant.

 However, it is the scope of the defendant's agreement with his co-conspirators that is dispositive of his responsibility for the drugs found in the upstairs closet. *United States v. Edwards,* 945 F.2d 1387, 1391–97 (7th Cir.1991) (stressing that "the most relevant factor in determining reasonable foreseeability" is "the scope of the defendant's agreement with other co-conspirators"). Notwithstanding the Court's conclusion that there was a single conspiracy, the evidence does not preponderate in favor of a conclusion that the scope of the defendant's agreement extended to the distribution of the 381 grams.

The 381 grams, which were packaged differently than the other narcotics found in and around the house, were of a far lower purity (48%) than the other drugs (62%, 63%, and 67%, respectively). Moreover, the 381 grams were of a different composition than the other drugs in evidence; one of the Government's witnesses, a DEA chemist, testified at trial that the 381 grams contained bicarbonates not present in the other drugs.

The different composition and the lower purity of the 381 grams indicate that it was already prepared for distribution; had it been cut any further it would likely have been unmarketable. The inference is that the 381 grams are severable from the other drugs; it is possible that the distribution thereof was not an object of the conspiracy which the defendant had agreed to undertake. In any event, there is no countervailing evidence demonstrating that the distribution of the 381 grams was within the scope of the defendant's conspiratorial agreement and reasonably foreseeable to him.

 Indeed, even if the defendant knew that his co-conspirators were dealing in much larger quantities, he is not accountable for those larger quantities unless his agreement was to assist in the distribution thereof. *See* U.S.S.G. § 1B1.3 n. 2(c)(7). The record does not contain any evidence of such an agreement. Rather, the defendant appears to have been a small time, novice dealer who sold a small amount of drugs over a short period of time and there is little or no evidence to support the attribution to him of a tremendous cache of drugs, hidden from view, packaged differently and of a different composition and far lower purity than all of the drugs for which the defendant concedes responsibility. In sum, the Court concludes that the defendant agreed to distribute a quantity of narcotics that did not include the 381 grams located in the upstairs bedroom closet.

## III. CONCLUSION

The relevant conduct taken into account in setting a base offense level for a defendant convicted of conspiracy includes only that which was within the scope of the defendant's agreement with his co-conspirators and reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake. Upon careful consideration of the parties' pleadings, the entire record herein, and the law applicable thereto, the Court concludes that the defendant's base offense level should be determined on the basis of the various amounts he sold, plus the amounts found on the side porch and in the furnace room. Totaling 16.939 grams, the specific amounts consist of the 9.92 grams the defendant admits to previously having sold, the .621 gram he sold to the undercover officers on September 4, 1990, the .31 gram he sold to an unidentified individual on September 4, 1990, the 2.716 grams seized on the side porch, plus the 3.372 grams seized inside the furnace room. U.S.S.G. § 2D1.1(c)(11) and (9), respectively (Eff. November 1, 1990). Accordingly, the defendant's base offense level is 26 and the Guideline range is 63 to 78 months. The Court shall enter an Order of even-date herewith consistent with this Opinion scheduling a further hearing to determine the appropriate sentence within the aforementioned range.