**UNITED STATES of America, Appellee,**

v.

**Lorenzo J. BAYLOR, Appellant.**

Nos. 95–3035, 95–3039.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 4, 1996.

Decided Oct. 4, 1996.

Michael T. Lempres, Washington, DC, argued the causes for appellants and filed the briefs for appellant Walter J. Smith. Lauren S. Kahn, appointed by the court, McLean, VA, was on the brief for appellant Lorenzo J. Baylor.

Elizabeth H. Danello, Assistant United States Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Roy W. McLeese, III, and Linda Otani McKinney, Assistant United States Attorneys, were on the brief.

Before: WALD, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Opinion concurring specially filed by Circuit Judge WALD.

ROGERS, Circuit Judge:

██ In these appeals from their convictions by a jury of conspiracy to distribute cocaine base, 21 U.S.C. § 846, distribution of cocaine base, *id.* § 841, and distribution of cocaine base within 1,000 feet of a school, in violation of *id.* § 860(a), appellants Lorenzo J. Baylor and Walter Jamal Smith raise separate and joint challenges. Smith contends that the district court abused its discretion in curtailing cross-examination of a key government witness on the subject of a prior conviction. Smith also contests the sufficiency of the evidence to sustain his conviction for drug distribution within 1,000 feet of a school.[1] Both appellants challenge the sufficiency of the evidence to support their convictions for conspiracy. Baylor further contends that the district court clearly erred by

increasing his base offense level to reflect his managerial role in the drug transactions, by failing to consider a downward departure based on a Sentencing Commission Report on cocaine sentencing policy, and by including as relevant conduct for purposes of calculating his base offense level drug amounts involved in counts of which he was acquitted. We affirm the judgments of conviction but, in view of the merger of the distribution counts with the "schoolyard statute" drug possession counts, we remand the case to the district court.

## I.

The government's evidence showed that in 1994 appellants Baylor and Smith, and indicted co-conspirator Douglas Coates, worked together to complete a series of transactions involving the distribution of cocaine base. Viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942), the evidence established that Baylor supplied the drugs to Coates, who then provided them to Smith for retail sale. On April 4, 1994, Coates introduced Smith to an undercover police officer at an apartment house located at 704 3rd Street, N.W., which was 534 feet from the Georgetown Law Center. Smith, the officer, and another man went to a small apartment located in the basement level of the building, where Smith produced a gym bag containing a large quantity of white rock substance. Smith then sold 10.21 grams of cocaine base to the officer for $500.

Following two other sales in April 1994 by Coates to the undercover officer, and after reporting that his supplier had just ordered a price increase to $1,200 for an ounce of crack, Coates introduced the officer to "his man" Baylor on May 19, 1994. After the officer gave Coates the money, Coates and Baylor entered a barbershop located in the one thousand block of U Street, N.W. When Coates returned he handed the officer a bag containing 21.431 grams of cocaine base.

---

1. Appellants have waived any challenge to the constitutionality of the "schoolyard statute," 21 U.S.C. § 860(a), because they failed to raise this issue in the district court. *United States v. Bau-* *cum,* 66 F.3d 362 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 204, —— L.Ed.2d —— (1996).

Coates stated that the quality of the cocaine was identical to that purchased by the officer on the three prior occasions. The May 19th sale occurred within 302 feet of Garnett Patterson Junior High School.

Prior to trial, Coates pled guilty to the distribution of 50 grams or more of cocaine base and agreed to testify for the government. Coates described his relationship with Baylor and Smith as having commenced in March 1993 when Baylor began to "front" between half an ounce and an eighth of a kilogram of cocaine base to Coates two or three times a week. Coates either sold the drugs himself or supplied other sellers, and paid Baylor only once the drugs were sold. Baylor determined where the two men would meet, the price of the cocaine sold, and whether Coates would be compensated in cash or cocaine. It was during this same period that Smith first approached Coates to ask whether he could procure drugs for him. In March and April 1993, Coates twice supplied Smith with one to two ounces of cocaine base that had been provided to him by Baylor. Monies paid by Smith to Coates were remitted to Baylor who, in turn, paid Coates a commission in the form of either money or cocaine. Smith informed Coates that he was selling the drugs at a homeless shelter located at 2nd and D Streets, N.W., and later at 704 3rd Street, N.W., and that he had two or three other persons working for him. Although the two lost contact during the summer of 1993, Smith approached Coates in October of that year to ask if Coates could still "work the deals for him." From November 1993 through March 1994, Coates sold Smith an eighth of a kilogram of cocaine base on six separate occasions. Each delivery was made with cocaine that had been provided to Coates by Baylor.

At trial, the government presented expert evidence concerning the typical features of drug conspiracies in the District of Columbia. According to the expert, drug distribution chains are frequently structured so that wholesalers and retailers have no direct contact with one another and instead work entirely through intermediaries.

In their defense, both appellants sought to impeach Coates' testimony. In addition to presenting other witnesses, Baylor testified that he had never had an agreement with Coates to sell drugs, and Smith denied that he ever bought cocaine from Coates. Following the government's rebuttal, the jury found Smith guilty of the April 4, 1994, distribution count, Baylor guilty of the May 19, 1994, distribution count, and both defendants guilty of conspiracy. Baylor was acquitted on counts relating to the distributions on April 4, 13, and 20, 1994.

## II.

Appellant Smith contends that the district court erred in restricting his cross-examination of Coates on the subject of Coates' prior conviction under the Bail Reform Act. On direct examination, Coates admitted his prior convictions for drug distribution, conspiracy to distribute cocaine, and violation of the Bail Reform Act. On cross-examination, Coates stated that the Bail Reform Act conviction had resulted not from his failure to perform under the conditions of his bail, but because he missed a court date. When asked by defense counsel why he had missed it, Coates explained that he had been incarcerated at the time. He then admitted to having been sentenced for the violation. At this point, the prosecutor objected that the inquiry went well beyond proper impeachment. Smith's counsel argued that he was entitled to inquire whether Coates had violated the conditions of his release in order to test his trustworthiness. In sustaining the objection, the district court ruled that "[Y]ou cannot go into the details of the conviction."

Under Federal Rule of Evidence 609(a), when evidence of a prior conviction is admitted for purposes of impeachment, cross-examination is usually limited to the essential facts rather than the surrounding details of the conviction. *United States v. Castro,* 788 F.2d 1240, 1246 (7th Cir.1986). Courts have recognized, however, that under certain circumstances details concerning a conviction may be elicited, and the district court's determination as to the nature and extent of the inquiry is reviewed for abuse of discretion. *See e.g., United States v. Swanson,* 9 F.3d 1354, 1357 (8th Cir.1993). On appeal the government maintains that once the na-

ture and date of Coates' Bail Reform Act conviction were established, Smith had no right to probe the underlying facts. Citing *United States v. Butler*, 924 F.2d 1124, 1130 (D.C.Cir.), *cert. denied*, 502 U.S. 871, 112 S.Ct. 205, 116 L.Ed.2d 164 (1991), however, the government acknowledges that a witness may "open the door" to more extensive cross-examination by attempting to minimize the conduct for which he was convicted.

Without knowing the facts underlying Coates' Bail Reform Act conviction, Coates' answers on cross-examination might well have been interpreted by a reasonable juror as an attempt to explain away the conviction. Certainly, Coates' testimony implied that he thought his incarceration was a defense to the Bail Reform Act charge. Consequently, Smith contends that the district court abused its discretion by cutting off cross-examination of a key government witness without allowing the defense an opportunity to ensure that the jury would understand the nature of Coates' conviction and could evaluate whether his explanation was credible.

Although we agree with the government that Coates' testimony sufficed to explain to the jury the basic nature of a Bail Reform Act violation, *see* D.C.Code § 23–1327, Coates' claim that he was incarcerated at the time could reasonably have been interpreted by the jury to suggest that Coates was unfairly convicted. Given the centrality of Coates' testimony and the efforts made by the defense to cast doubt on his credibility, the district court might well have afforded counsel some additional leeway in order to clarify the circumstances of the conviction. *See United States v. Wolf*, 561 F.2d 1376, 1381 (10th Cir.1977). The usual reason for caution with respect to the scope of cross-examination concerning a witness' prior conviction, namely, the need to protect from undue prejudice a defendant who takes the stand, is not at issue where, as here, the witness is not on trial. *See United States v. Mitchell*, 427 F.2d 644, 647 (3rd Cir.1970); FED.R.EVID. 609(a) (referencing Federal Rule of Evidence 403). Still, absent some indication that additional cross-examination would

have a measurable and independent impeachment value, the district court could reasonably want to avoid a mini-trial on Coates' Bail Reform Act conviction. On balance, the district court may simply have concluded that the jury had heard enough and appellants had nothing more to gain.

In any event, because the jury was aware of Coates' other convictions and learned that his plea agreement created an incentive for him to give testimony that would be viewed favorably by the government when he was later sentenced, any error in barring further impeachment was harmless. *See Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946). Any incremental inquiry regarding the Bail Reform Act conviction would have had little impeachment value, particularly since the undercover officer's testimony was sufficient to support the conviction for the April 4, 1994, sale, and his testimony about the May 19, 1994, sale corroborated Coates' general account of the workings of the conspiracy.

### III.

■ More problematic is appellant Smith's contention that the government failed to offer sufficient evidence to show that on April 4, 1994, Smith sold drugs within 1,000 feet of a school. Specifically, he contends that the government failed to prove that the basement apartment at 704 3rd Street, N.W., was less than 1,000 feet from the Georgetown University Law Center.[2] While the government introduced evidence that the distance between the Law Center and the "building line" of the apartment building at 704 3rd Street was 534 feet, it did not present a measurement reflecting the location of the actual apartment in which the April 4th drug sale occurred.

Under the "schoolyard statute," 21 U.S.C. § 860(a), which provides for enhancements for drug offenses, the government must prove that the possession of drugs occurred within 1,000 feet of a school. In *United States v. Johnson*, 46 F.3d 1166 (D.C.Cir. 1995), the court stated that, irrespective of

---

**2.** The government does not contend that Smith failed to preserve this issue by raising it in the

district court, and we express no opinion on the nature of a sufficient objection.

actual pedestrian travel routes, a straight line measurement can suffice to meet the requirements of the statute. *Id.* at 1169–70. The court in *Johnson* reversed the conviction, however, because the pedestrian route measurement of 994 feet only went up to the steps of the house and did not include the distance to the actual point within where the drug possession had occurred. *Id.* at 1170. The court observed that the government could not meet its burden of proof simply by asserting that a straight line distance would necessarily have been considerably shorter than the pedestrian route that formed the basis of the measurement offered in evidence. *Id.* In contrast to *United States v. Watson*, 887 F.2d 980 (9th Cir.1989) where evidence included a map that enabled the jury to approximate the distance omitted from the government's measurement, *id.* at 981, the court noted that the jury in *Johnson* had no such evidence upon which it could have based a similar conclusion. *Johnson*, 46 F.3d at 1170.

Consequently, in the instant case, the question is whether a measurement of 534 feet from the Law Center to the apartment building combined with the other evidence concerning the location of the relevant buildings and streets suffices to meet the government's burden of proof. A government evidence technician explained that, to arrive at the 534–foot measurement between the Law Center and the apartment building, he measured from the "building line" at 704 3rd Street to the wall of the freeway that separates 3rd Street from the Law Center, and then went north to Massachusetts Avenue, which crosses the freeway, and then measured across 2nd Street to the Law Center library. No direct evidence was introduced concerning the location of the basement apartment where the drug transaction took place, or the distance between the apartment and the exterior wall of the apartment building where the measurement was taken. The government did introduce into evidence a schematic map designed to show the spatial relationship between the apartment building and the Law Center, as well as three photographs that depicted the front of 704 3rd Street, N.W., the view of the apartment building from the Law Center, and the view of the Law Center from the apartment building.

The government maintains that the evidence was sufficient to enable a reasonable jury to conclude that the apartment building does not occupy the entire block bounded by 3rd, G, 4th, and H Streets, N.W. Thus, it contends, it would have been impossible for the basement apartment to have been as distant from the Law Center as the far northwest corner of the block depicted in the schematic map. Further, even if the building did occupy the entire block and the apartment were at the opposite corner of the block from the point where the measurement was taken, the map demonstrates that the length of the G Street block would not have pushed the total measurement over 1,000 feet. The government points out that because the distance between the Law Center and the eastern wall of the apartment building—encompassing the width of 3rd Street, the block between 3rd Street and the freeway, the freeway itself, the block between the freeway and 2nd Street, and 2nd Street—equals only 534 feet, it would be unreasonable to conclude that the width of the apartment building itself and the distance down to the basement could approach 466 feet.

Although the map was not introduced by the government for purposes of illustrating the 1,000 foot measurement and was never established as having been drawn to scale, it was in evidence before the jury as accurately depicting the location of the apartment building at 704 3rd Street and the surrounding area. The diagram showed that the building was located at the corner of 3rd and G streets. We conclude that when considered in combination, the 534–foot measurement, map, and photographs were sufficient to permit a reasonable juror to conclude that the distance from the "building line" to the basement apartment did not exceed 466 feet. Spatial relationships are hardly intuitive, and photographs can distort distances. Nevertheless, given the evidence regarding the vast area represented by the 534–foot measurement, the jury could have concluded that the physical configuration that would have been required for the unmeasured area be-

tween the "building line" and the basement apartment to be 466 feet or more was fundamentally inconsistent with the photographs of the apartment building and the adjacent streets as well as the schematic map. Smith's speculation that the basement apartment might have been several floors below ground is contradicted by the undercover officer's testimony that the apartment was on "*the* lower level" (emphasis added). In contrast to both *Johnson* and *United States v. Applewhite,* 72 F.3d 140 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1864, 134 L.Ed.2d 962 (1996), on which Smith relies, where the government faced the difficulty of showing that its evidence precluded a finding that an unmeasured leg could have been more than 80 feet long, here the government had far more spatial leeway, and needed only to show, through the photographs and map, that the missing distance was 466 feet or less. Obviously, the government should not undermine its own case by offering incomplete measurements. Under the circumstances, however, with substantial room to spare before reaching the 1,000 foot limit, the government's measurement, when combined with the map and the photographs of the buildings and the freeway, was sufficient to show that the April 4 sale occurred within 1,000 feet of a school.

## IV.

Neither appellant's contention that there was insufficient evidence to support his conviction for conspiracy is persuasive. *See Glasser,* 315 U.S. at 80, 62 S.Ct. at 469–70. The evidence showed an agreement between two or more persons to distribute cocaine and that appellants were knowing participants in the agreement. *See United States v. Thorne,* 997 F.2d 1504, 1512 (D.C.Cir.), *cert. denied,* 510 U.S. 999, 114 S.Ct. 568, 126 L.Ed.2d 467 (1993); *United States v. Lam Kwong–Wah,* 924 F.2d 298, 303 (D.C.Cir. 1991), *cert. denied,* 506 U.S. 901, 113 S.Ct. 287, 121 L.Ed.2d 213 (1992). In the face of overwhelming evidence of Baylor's complicity in a series of drug transactions, his acquittal on charges of aiding and abetting transactions that took place in April 1993 is irrelevant. *See United States v. Morris,* 836 F.2d 1371, 1373 (D.C.Cir.1988). Notwithstanding

Baylor's attempts to discredit Coates' testimony, he did not introduce evidence that contradicted Coates' basic description of the dealings between himself and Baylor. As the government points out in its brief, that the jury might have been unwilling to rely exclusively on Coates' testimony to convict Baylor of transactions of which he was not specifically aware does not mean that the jury rejected Coates' testimony entirely.

Although appellant Smith argues that the evidence showed nothing more than a buyer-seller relationship between himself and Coates, there was testimony that Coates introduced the undercover officer to Smith and that Smith advised the officer that he could be contacted through Coates. The evidence also showed that Smith originally approached Coates to determine if he would procure wholesale quantities of drugs for him, thus recognizing that Coates would act as a middleman between Smith and a supplier who would turn out to be Baylor. That Smith never met Baylor is irrelevant. *United States v. Jenkins,* 928 F.2d 1175, 1178 (D.C.Cir.1991); *United States v. Tarantino,* 846 F.2d 1384, 1392 (D.C.Cir.), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *see also United States v. Childress,* 58 F.3d 693, 709–10 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996). The size of the orders that Coates was able to fill provided an additional basis upon which a jury could conclude that Smith knew he had tapped into an established drug operation. From this evidence a reasonable jury could find that Smith and Coates were working together in an ongoing, cooperative purchaser-middleman relationship where they were dependent upon one another for drugs and profits respectively. *See United States v. Sobamowo,* 892 F.2d 90, 94 (D.C.Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990); *United States v. Medina,* 944 F.2d 60, 65–66 (2d Cir.1991), *cert. denied,* 503 U.S. 949, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992).

## V.

Finally, Baylor's sentencing challenges fail. His challenge to the district

court's increase of his base level by two points to reflect his managerial role under the United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1(c) (1994) is meritless. The district court had sufficient evidence on which to conclude that Baylor exercised control over and organized the activities of at least one other person involved in distributing the drugs. *See United States v. Hazelett,* 80 F.3d 280, 284 (8th Cir.1996). Relying upon the evidence concerning Baylor's role in the May 19, 1994, transaction and Coates' testimony about Baylor's decision-making authority, we find no clear error. *See United States v. Sutera,* 933 F.2d 641, 649 (8th Cir. 1991).

Nor has Baylor shown that a remand is warranted to enable the district court to consider a downward departure under U.S.S.G. § 5K2.0. His reliance on the Sentencing Commission's Special Report of February 1995 criticizing the present 100:1 ratio for weighing cocaine base and cocaine powder is unavailing in light of *United States v. Anderson,* 82 F.3d 436 (D.C.Cir.1996). Although, for reasons set forth in the opinion of Judge Wald, concurring specially, *infra,* Baylor's challenge to the district court's treatment as relevant conduct of drug amounts involved in the counts for which he was acquitted is not without persuasive force, *United States v. Boney,* 977 F.2d 624, 635–36 (D.C.Cir.1992), is controlling in this circuit.

## VI.

■ Accordingly, we affirm the judgments of conviction. All parties agree, however, that the convictions for the April 4 and May 19 distribution counts, 21 U.S.C. § 841, merge with the convictions under the "schoolyard statute," 21 U.S.C. § 860(a). *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Whren,* 53 F.3d 371, 376 (D.C.Cir.1995), *aff'd,* — U.S. —, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). At the time appellants were sentenced, courts in this circuit followed the practice of imposing sentences on all counts of which a defendant was convicted, leaving vacation of any lesser count until completion of the appeal. *See e.g., United States v. Dale,* 991 F.2d 819, 859

(D.C.Cir.), *cert. denied,* 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993). *See also United States v. Aiello,* 771 F.2d 621, 634 (2d Cir.1985); *United States v. Fernandez,* 916 F.2d 125, 128–29 (3d Cir.1990), *cert. denied,* 500 U.S. 948, 111 S.Ct. 2249, 114 L.Ed.2d 490 (1991). Most recently, in *Rutledge v. United States,* — U.S. —, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996), the Supreme Court clarified *Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), in which the Court had stated that, when a defendant is found guilty of both lesser and greater offenses, the district court should enter judgment on only one of the counts. *Id.* at 865, 105 S.Ct. at 1673–74. The *Rutledge* Court rejected the use of multiple convictions to provide a "back up" conviction in order to ensure that a defendant who successfully challenges a greater offense does not escape punishment. — U.S. at —, 116 S.Ct. at 1249. "[W]hen a conviction for a greater offense is reversed on grounds that affect only the greater offense," the Court explained, the appellate court "may direct the entry of judgment for a lesser included offense." *Id.* at —, 116 S.Ct. at 1250. Thus, the Court indicated that the district court should instruct the jury "not to return a verdict on a lesser included offense once it has found the defendant guilty of the greater offense." *Id.* at — n. 16, 116 S.Ct. at 1250 n. 16.

While the government seeks remand only for vacation of the judgments on the § 841 counts, appellants contend that resentencing is warranted in light of the sentencing range available to the district court under the Sentencing Guidelines. Because the district court made a sufficient record of its intentions at trial, indicating that its awareness of the merger issue and its concern about the government's duplicative charging practices would cause it to impose only concurrent sentences if appellants were convicted on both the greater and lesser counts, a remand for resentencing would appear unnecessary. *See United States v. Lewis,* 482 F.2d 632, 647 (D.C.Cir.1973); *United States v. Wimbush,* 475 F.2d 347, 348 (D.C.Cir.1973); *see also United States v. McKnight,* 17 F.3d 1139, 1147 (8th Cir.1994) (Magill and Hansen, JJ., concurring), *cert. denied,* — U.S. —, 115

S.Ct. 275, 130 L.Ed.2d 192 (1994). Given the absence of clear circuit precedent on point since the enactment of the Sentencing Guidelines, *cf. United States v. Fennell,* 77 F.3d 510, 510–11 (D.C.Cir.1996) (per curiam), we remand the cases so that the district court can vacate each appellants' judgment of conviction for the distribution counts, without prejudice to appellants' right to seek resentencing in light of vacation of one of their convictions.

WALD, Circuit Judge, concurring specially:

Although the jury convicted Baylor only on the charges of conspiracy and the two distribution charges based on the May 19 transaction, the sentencing court, following the mandate of United States Sentencing Guidelines § 1B1.3(a)(2),[1] ruled that Baylor's participation in the April transactions of which the jury acquitted him had been shown by a preponderance of the evidence, and accordingly adjusted Baylor's offense level under § 2D1.1(c)(2) to reflect the quantity of drugs involved in these transactions as well. As a result, Baylor's base offense level and his ultimate sentence were exactly the same as they would have been had the jury found him guilty, instead of acquitting him, on the April transactions. There is something fundamentally wrong with such a result.

Guideline "law," I am well aware, runs overwhelmingly against Baylor's claim that a sentencing court should not use the core conduct underlying an acquittal to increase an offender's base offense level for the crimes of which he was convicted. This circuit has gone along with most other circuits in ruling that the guidelines and the law authorizing their creation permit such use, and that this practice is constitutional. *See United States v. Boney,* 977 F.2d 624, 635–36 (D.C.Cir.1992) (citing cases from all circuits except the Ninth). Only the Ninth Circuit has held to the contrary, claiming that "[w]e would pervert our system of justice if we allowed a defendant to suffer punishment for a criminal charge for which he or she was acquitted." *United States v. Brady,* 928 F.2d 844, 851 (9th Cir.1991).

But this consensual surface is eroded by a growing body of resistance to what commentators and scholars recognize as a blatant injustice. Despite the near unanimity of the circuit holdings, many individual judges have expressed in concurrences and dissents the strongest concerns, bordering on outrage, about the compatibility of such a practice with the basic principles underlying our system of criminal justice.[2]

---

1. U.S.S.G. § 1B1.3(a)(2) provides that, in determining an offender's base offense level, a sentencing judge must consider:

   solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions [committed by the offender or foreseeably resulting from a jointly undertaken criminal activity] that were part of the same course of conduct or common scheme or plan as the offense of conviction[.]

   U.S.S.G. § 3D1.2(d) requires grouping of multiple counts:

   When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

2. *See, e.g., United States v. Frias,* 39 F.3d 391, 392–94 (2d Cir.1994) (Oakes, J., concurring) ("This is jurisprudence reminiscent of *Alice in Wonderland.* As the Queen of Hearts might say, 'Acquittal first, sentence afterwards.' "); *United States v. Hunter,* 19 F.3d 895, 897–98 (4th Cir. 1994) (Hall, J., concurring) ("[A]s regards charges on which the jury has acquitted the defendant, ['pricing' these charges at the same level of severity as convicted conduct for sentencing purposes] is just wrong."); *United States v. Concepcion,* 983 F.2d 369, 395–96 (2nd Cir.1992) (Newman, J., dissenting from the denial of a request for rehearing in banc) ("In some way, the law must be modified. A just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in a conviction and an allegation of conduct resulting in an acquittal."); *Boney,* 977 F.2d at 637–47 (D.C.Cir.1992) (Randolph, J., dissenting in part and concurring in part) ("My analysis, and my colleagues' . . . rests somewhat uneasily with the 'special weight' the Supreme Court has accorded acquittals in its Double Jeopardy jurisprudence."); *United States v. Galloway,* 976 F.2d 414, 436–44 (8th Cir.1992) (Bright, J., dissenting) ("If the former Soviet Union or a third world country had permitted [the practice of punishing people for conduct that had not been the subject of indictment or trial] human rights observers would condemn those countries."); *United States v. Restrepo,* 946 F.2d 654, 664–79 (9th Cir.1991) (Norris, J., dissenting) (arguing that the 'preponderance of the evidence' standard for counting

Although I fully recognize that *Boney* requires affirmance on this issue, to my mind the use of acquitted conduct in an identical fashion with convicted conduct in computing an offender's sentence leaves such a jagged scar on our constitutional complexion that periodically its presence must be highlighted and reevaluated in the hopes that someone will eventually pay attention, either through a grant of certiorari to resolve the circuit split, or a revision of the guidelines by the Sentencing Commission, or legislation to bar such a result; in Chief Judge Newman's words "the law must be modified." [3] Time and experience show us increasingly that the assumptions underlying the decisions upholding the use of acquitted conduct to enhance sentencing are not sound.

The practice of sentencing defendants on the basis of crimes for which the defendant has been acquitted has been plausibly attacked along many jurisprudential fronts, including double jeopardy,[4] failure to honor the right to a jury trial,[5] failure to satisfy the "notice" requirement of a grand jury indictment,[6] and due process.[7] The explanation offered to defendants who object that they are being punished for crimes of which they have not been convicted is invariably that they "misperceive[ ] the distinction between a sentence and a sentence enhancement," and that by adding the full measure of punishment specified in the guidelines for crimes of which they are not convicted, the court is merely "enhancing" the penalty for the crime of which they are convicted, not imposing liability for a separate crime. *Boney*, 977 F.2d at 636 (quoting *United States v. Mocciola*, 891 F.2d 13, 17 (1st Cir.1989)).[8] The

conduct underlying acquitted charges in sentencing should be rejected) ("Circuit has followed circuit without, in some cases, even a vestige of independent analysis. ... There are signs, however, that the dam is finally cracking, signs of an emerging awareness of the truly profound implications of the changes the Guidelines have wrought." (citing *Brady*)); *United States v. Kikumura*, 918 F.2d 1084, 1100–01 (3d Cir.1990) ("This [twelve-fold increase in the sentence] is perhaps the most dramatic example imaginable of a sentencing hearing that functions as 'a tail which wags the dog of the substantive offense.' (Quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986)). In this extreme context, we believe, a court cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations."); *United States v. Jones*, 863 F.Supp. 575, 578 (N.D.Ohio 1994) ("The right to a trial by jury means little if a sentencing judge can effectively veto the jury's acquittal on one charge and sentence the defendant as though he had been convicted of that charge." (citing *Brady*)); *United States v. Cordoba–Hincapie*, 825 F.Supp. 485, 487 (E.D.N.Y.1993) ("Can the guarantees of a jury trial to determine the substantive predicates of criminality be shortcircuited by characterizing a critical element of great significance in deciding punishment as one for the judge to determine in fixing sentence—a sentence predetermined under fixed guidelines, not one imposed under a discretionary regime? ... Congress could not have intended such a bizarre and dangerous result when it adopted guideline sentences").

A parallel body of work condemning sentencing based on acquitted conduct has been growing in the academic community. *See, e.g.,* Kevin R. Reitz, *Sentencing Facts: Travesties of Real–Offense Sentencing*, 45 STAN L.REV 523 . (1993); David Yellen, *Illusion, Illogic, and Injustice:*

*Real–Offense Sentencing and the Federal Sentencing Guidelines*, 78 MINN. L.REV. 403 (1993); Elizabeth T. Lear, *Is Conviction Irrelevant?*, 40 UCLA L.REV. 1179 (1993); Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 YALE L.J. 1681 (1992); Michael Tonry, *Salvaging the Sentencing Guidelines in Seven Easy Steps*, 4 FED. SENTENCING REP. 355, 356–57 (1992); Gerald W. Heaney, *The Reality of Guidelines Sentencing: No End to Disparity*, 28 AM.CRIM. L.REV 161, 208–20 (1991).

3. *Concepcion*, 983 F.2d at 396 (Newman, J., dissenting from the denial of a petition for rehearing).

4. *See, e.g., United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 181–82 (2d Cir.), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990).

5. *See, e.g., Jones, supra* note 2.

6. *See* Lear, *supra* note 2, at 1229–33.

7. *See, e.g., Restrepo, supra* note 2, at 664–79 (Norris, J., dissenting).

8. In his separate concurring opinion, Judge Randolph recognized that "this conceptual nicety might be lost on a person who ... breathes a sigh of relief when the not guilty verdict is announced without realizing that his term of imprisonment may nevertheless be 'increased' if, at sentencing, the court finds him responsible for the same misconduct. That the Double Jeopardy Clause protects him from reprosecution on the acquitted count, or that his acquittal means that his maximum potential sentence will be determined solely on the basis of the count on which

"enhanced" sentence, after all, still must fall within the statutory range set out for the crime of conviction. *See Boney,* 977 F.2d at 636.

Some of our own judges have recognized that this justification could not pass the test of fairness or even common sense from the vantage point of an ordinary citizen.[9] The "law," however, has retreated from that standard into its own black hole of abstractions. The fact remains that when the conduct which serves as the basis for a sentence "enhancement" is in fact treated by the criminal statutes and the sentencing guidelines as a discrete crime, separately charged in the indictment, and subjected to a separate determination of guilt or innocence by a jury, treating it subsequently at the sentencing stage as just another "factor" to be considered in "enhancing" the sentence for the crime of conviction introduces an artificiality into the process that violates time honored constitutional principles designed to protect criminal defendants.

The fact that the ultimate sentence based on both convicted and acquitted conduct falls below the statutory maximum for the crime of conviction does little, if anything, to counteract the basic unfairness of counting acquitted conduct. The statutory maxima for many felonies, which can run as high as 30 or 60 years, were originally set in an era of indeterminate sentencing and parole; the prevailing ideology of punishment was rehabilitation, and the system was designed to provide that offenders would remain in prison only until they had been "rehabilitated," meaning prisoners often would be released after serving as little as one-third of their original sentences.[10] The concept of guideline sentencing, on the other hand, was motivated by Congress' determination that indeterminate sentencing and parole discretion resulted in unwarranted sentence disparities, and must be replaced by more rigid formulas allowing little or no discretion on the part of the judge.[11] Thus the escape valves attached to the long sentences originally prescribed by statute have been slammed shut, and statutory maxima that were designed to cover the most egregious conceivable manifestations of particular crimes, and thus to far exceed the appropriate sentence in the average case,[12] cannot be relied on to cabin within reasonable limits the cumulative penalties for convicted and acquitted charges.

Some courts have felt themselves constrained by the Supreme Court's decision in *McMillan v. Pennsylvania*[13] to respect the "punishment/enhancement" fiction that underlies the authorization for counting acquitted conduct in § 1B1.3(a)(2).[14] A close reading of that opinion, and of the *Specht v. Patterson*[15] decision to which it refers, however, suggests that even that fiction has boundaries which this portion of the guidelines has crossed over.

The statute reviewed in *Specht* authorized a sentencing court to determine that a person convicted of enumerated sex offenses constituted a threat to the public, or was an habitual offender and mentally ill, and on this basis to increase the sentence from the term specified in the crime of conviction to an indeterminate term between one day and life imprisonment.[16] The statute made no provision for notice or hearing preceding this determination. The Court held that the statute

he was convicted is doubtless of little comfort." *Boney,* 977 F.2d at 647 (Randolph, J., dissenting in part and concurring in part).

9. *See supra* note 8.

10. *See* Michael H. Tonry, *Real Offense Sentencing: The Model Sentencing and Corrections Act,* 72 J.Crim. L. & Criminology 1550, 1593 (1981).

11. *See* 18 U.S.C. § 3553(a)(6) (1994).

12. *See* Michael Tonry, *Sentencing Guidelines and the Model Penal Code,* 19 Rutgers L.J. 823, 845 (1988).

13. 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

14. *See, e.g., United States v. Mobley,* 956 F.2d 450, 455 (3d Cir.1992).

15. 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

16. *See id.* at 607–08, 87 S.Ct. at 1210–12.

was "deficient in due process" as it provided for "the making of a new charge leading to criminal punishment" without affording the defendant the safeguards considered essential to a fair trial.[17]

In *McMillan*, the Supreme Court addressed a challenge to Pennsylvania's Mandatory Minimum Sentencing Act [18] based in the Due Process Clause of the Fourteenth Amendment and the jury trial guarantee of the Sixth Amendment. The Act provided that anyone convicted of certain felonies must be sentenced to at least five years' imprisonment if the judge finds by a preponderance of the evidence that the person "visibly possessed a firearm" during the commission of the offense.[19] Individuals subjected to this sentence enhancement argued that the firearm possession was actually an element of the crime, and thus under *In re Winship* [20] must be proved beyond a reasonable doubt, and in the alternative that due process required that the firearm component be subject to a higher standard of proof than preponderance of the evidence.[21]

The Court found merit in neither claim, holding that Pennsylvania's "chosen course in the area of defining crimes and prescribing penalties" did not violate the standard articulated in *Specht*.[22] The Court noted that it had "never attempted to define precisely the constitutional limits noted in [*Specht*], *i.e.*, the extent to which due process forbids the reallocation or reduction of burdens of proof in criminal cases," and declined now to proffer any such definition, in light of other factors making it unnecessary to reach this issue.[23] The Court noted, first, that the Pennsylvania Act created no presumptions of

guilt and did not relieve the government of its burden of proving guilt, but rather became applicable only "after a defendant has been duly convicted of the crime for which he is to be punished." [24] Next, the Court observed that the Act enumerated felonies carrying maximum sentences of ten or twenty years, "upp[ing] the ante" for these felonies only insofar as the minimum sentence could not fall below five years; the Court concluded that the statute gave "no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense." [25] The Court rejected the petitioners' invocation of *Specht*, noting that the statute struck down in *Specht* subjected the defendant to a " 'radically different situation' from the usual sentencing proceeding," whereas the Act merely raised the minimum sentence that may be imposed by the trial court.[26] Finally, the Court rejected the petitioners' warning that States would use any leeway the Court allowed them to restructure existing crimes in such a way as to evade the due process requirements announced in *Winship*, observing that Pennsylvania's legislature had not changed the definition of any existing offense.[27]

The Court then turned to the petitioners' "subsidiary" claim that visible possession of a firearm should be subjected to a higher standard of proof than "preponderance of the evidence." Citing to the 1949 decision in *Williams v. New York*,[28] the Court quickly dispensed with this argument on the basis of that decision's holding that due process is not violated by the sentencing court's "traditional[ ]" practice of hearing evidence and finding facts "without any prescribed burden of proof

---

17. *Id.* at 611, 87 S.Ct. at 1213.

18. 42 Pa.C.S.A. § 9712 (1982).

19. *See McMillan*, 477 U.S. at 81–82, 106 S.Ct. at 2413–14.

20. 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

21. *See McMillan*, 477 U.S. at 83–84, 106 S.Ct. at 2414–15.

22. *See id.* at 86, 91–93, 106 S.Ct. at 2416, 2418–20.

23. *See id.* at 86, 106 S.Ct. at 2416.

24. *Id.* at 87, 106 S.Ct. at 2417.

25. *Id.* at 88, 106 S.Ct. at 2417.

26. *See id.* at 89, 106 S.Ct. at 2417–18.

27. *See id.* at 89–90, 106 S.Ct. at 2417–18.

28. 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

at all." [29]

In addressing both sets of arguments pressed by the petitioners, the *McMillan* Court not only affirmed the continued vitality of *Specht*, but also used language that limited its holding regarding the inapplicability of *Specht* to situations in which the sentence "enhancement" relates to the particular event on which the conviction is based. The Court held that the Act did not fall under *Specht* because it "only bec[ame] applicable after a defendant has been duly convicted of *the crime for which he is to be punished.*" *McMillan,* 477 U.S. at 87, 106 S.Ct. at 2417 (emphasis added). Rejecting the claim that a higher burden of proof should apply, the Court noted that "[s]entencing courts necessarily consider the circumstances of *an offense* in selecting the appropriate punishment, and we have consistently approved sentencing schemes that mandate consideration of facts related to *the crime,* without suggesting that those facts must be proved beyond a reasonable doubt." *Id.* at 92, 106 S.Ct. at 2419 (emphases added).

The Court's apparent assumption that punishment will relate to the crime of conviction, rather than to crimes for which the defendant has been acquitted, reflects a commonality of understanding about fundamental fairness shared by scores of judges and academics,[30] as well as every nonfederal jurisdiction in the nation that has implemented guideline sentencing.[31] The Federal Guidelines stand alone in perpetuating their anomalous treatment of acquittals in sentencing.

In sum, I do not believe the Supreme Court has yet sanctioned the intolerable notion that the same sentence can or must be levied on a person convicted of one crime, and acquitted of three "related" crimes, as can be imposed on his counterpart convicted of all four crimes. The result of such a system is subtly but surely to eviscerate the right to a jury trial or to proof beyond a

reasonable doubt for many defendants. Yet we appear to have relentlessly, even mindlessly progressed down the path. It is time to turn back. The British novelist G.K. Chesterton once said: "[W]hen two great political parties agree about something, it is generally wrong." [32] I am afraid the same can be said in this one instance about great circuit courts.

---

**29.** *McMillan,* 477 U.S. at 91–92, 106 S.Ct. at 2419.

**30.** *See supra* note 2.

**31.** *See Tonry, supra* note 2, at 356–57 (noting that the Federal Sentencing Commission is the only sentencing commission in the nation to reject the "charge offense" model, whereby sentences are

based solely on crimes for which a defendant has been convicted, in favor of the "real offense" model, which allows sentencing courts to consider unconvicted and even acquitted crimes in setting the sentence).

**32.** Jonathon Green, The Cynic's Lexicon 46 (1984).