# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 8, 2005          Decided January 31, 2006

No. 04-3078

UNITED STATES OF AMERICA,
APPELLEE

v.

CRICTINO FONSECA,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00106-01)

---

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Mary M. Petras* and *Neil H. Jaffee*, Assistant Federal Public Defenders, entered appearances.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, *John R. Fisher*, Assistant U.S. Attorney at the time the brief was filed, and *Elizabeth Trosman*, Assistant U.S. Attorney. *Roy W. McLeese, III*, Assistant U.S. Attorney, entered an appearance.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  A jury found defendant Crictino Fonseca guilty of unlawful possession of a firearm and ammunition by a convicted felon.  Fonseca raises two issues that are in contention on this appeal.  First, he argues that the district court violated the Speedy Trial Act by not beginning the trial that resulted in his conviction until after the statutory deadline.  Second, he asserts that the court abused its discretion by limiting his cross-examination of a government witness.  Concluding that the district court neither violated the Speedy Trial Act nor abused its discretion in circumscribing cross-examination, we affirm the judgment of conviction.[1]

I

On March 11, 2003, Fonseca was indicted on a charge of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  Fonseca's first trial stemming from this indictment began on August 18, 2003.  Due to the jury's inability to reach a unanimous verdict, the district

---

[1]Fonseca also argues, and the government agrees, that -- in the course of imposing a sentence on Fonseca prior to the Supreme Court's decision in *United States v. Booker* -- the district court erred by treating the United States Sentencing Guidelines as mandatory. *See United States v. Booker*, 543 U.S. 220 (2005).  Further agreeing that the record is insufficient to "determine with confidence whether the defendant suffered prejudice from the *Booker* error," *United States v. Coles*, 403 F.3d 764, 765 (D.C. Cir. 2005), both parties suggest that we remand the record to the District Court "so that it may determine whether it would have imposed a different sentence, materially more favorable to the defendant, if sentencing had taken place under the post-*Booker* sentencing regime." *Id*.; *see* Appellant's Br. at 26-27; Appellee's Br. at 39-42.  We accept the parties' suggestion and remand the record for this limited purpose.

court declared a mistrial on August 26, 2003. On February 6, 2004, five months after the mistrial, Fonseca filed a motion to dismiss the indictment, alleging that the court had failed to begin his retrial within the time required by the Speedy Trial Act, § 18 U.S.C. 3161(e). The district court denied Fonseca's motion to dismiss, and a retrial was commenced on February 25, 2004.

At the retrial, Liz'a Williams testified that she lived in an apartment at 601 Park Road in northwest Washington, D.C. Fonseca was the resident manager of the apartment building. On the evening of February 15, 2003, Williams went to a neighbor's house at 613 Park Road, where she and her friends played cards, ate pizza, and drank piña coladas. Sometime during the night, a heavy snow began to fall. At 7:00 a.m. the next morning, Williams, along with her friend Wanda Johnson and Fonseca's girlfriend Kee-Kee, walked back toward 601 Park Road, arguing loudly with one another. As the women stood outside the apartment building quarreling, Fonseca leaned out of the window of his second-floor apartment, which overlooked the front of the building. Fonseca, who was holding a handgun, first cursed at the women and then fired three shots at them. The women ducked behind a parked car.

Metropolitan Police Department Officer Michael Rackey testified that, at approximately 7:00 a.m. on February 16, he and Officer Jeffrey Byrd drove to 601 Park Road in response to a police radio report. They arrived at the scene within minutes and were approached by Williams and Johnson, who said that three shots had been fired at them from a second-floor window. The women gave the officers a physical description of the shooter and said that he was the building manager of 601 Park Road.

Rackey testified that, after speaking with the women, the officers entered the building, proceeded to the second-floor

apartment identified by Williams, and knocked on the door. As they stood there knocking, the officers noticed defendant Fonseca ascending the stairs from the basement. Because he matched the description of the shooter provided by Williams and Johnson, the officers arrested Fonseca on the spot. They then entered Fonseca's apartment and found that the window from which the women said the shots had been fired was open.

Officer Rackey testified that he next went to the building's basement to search the area from which he had heard Fonseca emerge. After opening the basement's exterior door, Rackey saw a single set of footprints in the freshly fallen snow. The footprints led to a garbage bag, topped by an automobile tire. Rackey lifted the tire and discovered a plastic bag containing a revolver. The gun's six chambers held three live rounds and three expended shell casings.

In his defense, Fonseca called two witnesses. The first was a forensic toxicologist from District of Columbia Pretrial Services, who testified that Liz'a Williams had tested positive for cocaine on January 13, 2003, following her arrest on an unrelated charge of possessing drug paraphernalia. The district court admitted the testimony to impeach Williams' statement, made during cross-examination, that she had not used drugs since 2002. The defense also called Officer Byrd, who testified that he thought the window that Williams and Johnson had indicated as the location of the shooter was on the side of the building, rather than the front. Fonseca did not testify.

On March 4, 2004, the jury found Fonseca guilty as charged. On June 14, the district court sentenced him to a term of 104 months' imprisonment. We consider the two challenges to Fonseca's conviction below.

5

II

Fonseca's first contention is that his retrial violated the Speedy Trial Act because it did not commence until February 25, 2004, six months after his first trial ended in a mistrial. We review this challenge, which concerns the meaning of the Act's statutory language, de novo. *See Zhu v. Gonzales*, 411 F.3d 292, 294 (D.C. Cir. 2005).

Under the Speedy Trial Act, the trial of a defendant charged in an indictment must begin "within seventy days from the filing date" of the indictment or from the date the defendant appears before a judicial officer, whichever date occurs later. 18 U.S.C. § 3161(c)(1). "If the defendant is to be tried again following a declaration by the trial judge of a mistrial," as was the case here, "the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). The parties agree that "the date the action occasioning the retrial" became final in this case was August 26, 2003, the date the district court declared a mistrial. They further agree that "seventy days from the date" of that action was November 4, 2003 -- seventy days after August 26, not counting August 26 itself. *See United States v. Westbrook*, 119 F.3d 1176, 1186 (5th Cir. 1997); *Gov't of Virgin Islands v. Duberry*, 923 F.2d 317, 320 n.8 (3d Cir. 1991); Speedy Trial Plan of the United States District Court for the District of Columbia, at 10 (Oct. 30, 2002). Accordingly, unless another statutory provision is applicable, both parties agree that the deadline for commencement of the retrial was November 4, 2003.

There is another applicable provision. The Speedy Trial Act provides that certain "periods of delay shall be excluded in computing" the seventy-day period. 18 U.S.C. § 3161(h). The exclusion at issue here is that described in § 3161(h)(1)(F), which covers "delay resulting from any pretrial motion, from the

filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). The government filed such a pretrial motion on the morning of November 4, 2003, the seventieth day after the mistrial. The court did not resolve that motion until the day the retrial began, February 25, 2004.

Fonseca contends that the government filed its pretrial motion one day too late. According to the defendant, the period of exclusion -- "from the filing of the motion through the . . . disposition of [] such motion" -- does not begin until the day after the motion is filed. Under that view, the period of exclusion did not begin until November 5, 2003, too late to save a retrial that had to begin no later than November 4.

We disagree. In our view, the most natural reading of the phrase "from the filing of the motion" is that the period of exclusion begins immediately "from the filing." Fonseca's position, that the period begins from "the day after" the filing, would require the insertion of language not in the statute. Although we have never had occasion to reach a holding on this issue, we have previously suggested that the period of exclusion begins on the day a pretrial motion is filed. *See United States v. Wilson*, 835 F.2d 1440, 1441 n.2 (D.C. Cir. 1987). This was also the view of the Committee on the Administration of the Criminal Law of the Judicial Conference of the United States. *See* Guidelines to the Administration of the Speedy Trial Act of 1974, as Amended (Dec. 1979 rev., with amendments through Oct. 1984), 106 F.R.D. 271, 288 (1984). And it is the reading of all but one of the circuits that have considered the question. *See United States v. Daychild*, 357 F.3d 1082, 1092-93 (9th Cir. 2004); *United States v. Westbrook*, 119 F.3d 1176, 1186 (5th Cir. 1997); *United States v. Parker*, 30 F.3d 542, 546-47 (4th Cir. 1994); *United States v. Jodoin*, 672 F.2d 232, 237 n.7 (1st Cir. 1982) (Breyer, J.). Only the Sixth Circuit computes the

starting date for this exclusion from the day after the motion is filed, and it has offered no explanation for that view other than circuit precedent. *See United States v. Thomas*, 49 F.3d 253 (6th Cir. 1995).[2]

Fonseca argues that there is no justification for beginning the date of the exclusionary period *on* the date of the filing of a pretrial motion for purposes of § 3161(h)(1)(F), while not starting the seventy-day clock until the day *after* the filing date of an indictment or the day *after* the action occasioning the retrial becomes final for purposes of § 3161(c)(1) and (e). But there is a justification: the statutory language governing the starting of the Speedy Trial Act clock is different from the language governing its tolling. The former requires the trial to commence "*within* seventy days from the filing *date*" or "*within* seventy days from the *date*" of the action requiring retrial. 18 U.S.C. § 3161(c)(1) & (e) (emphasis added). The latter tolls the clock "from the filing of the motion."

Accordingly, we conclude that the period of delay resulting from the filing of the government's motion in this case began on November 4, 2003, in time to save Fonseca's retrial from violating the Speedy Trial Act.

III

Fonseca's second contention is that the district court erred in barring his counsel from cross-examining Liz'a Williams about a crack pipe found in her purse when she was arrested in January 2003. We review a district court's evidentiary rulings, including those involving the scope of cross-examination, for abuse of discretion. *United States v. Coumaris*, 399 F.3d 343,

---

[2]The precedent cited, *United States v. Bowers*, 834 F.2d 607 (6th Cir. 1987), also offers no explanation.

347 (D.C. Cir. 2005); *see United States v. Abel*, 469 U.S. 45, 54-55 (1984).  Before examining the legal considerations, we first describe the trial proceedings that led to defense counsel's failed attempt to cross-examine Williams regarding the pipe.

A

During her cross-examination of Williams, Fonseca's counsel asked Williams whether she was not just drinking piña coladas on the night in question, but was "also getting high that night."  3/1/04 Tr. at 207.  After Williams responded, "I don't use drugs," the district court called the attorneys to the bench and asked Fonseca's counsel what her "good-faith basis [was] for believing there were drugs."  *Id.*  Counsel responded that Fonseca's girlfriend, Kee-Kee, had told her that the women "were getting high that night."  *Id.*  Defense counsel further noted that Williams had answered the cross-examination question by stating that she did not use drugs, and counsel said that she now expected Williams would repeat her statement from the first trial that she had not used drugs since she suffered a heart attack in June 2002.  Counsel told the court that she had evidence that this statement was false:  Williams had been arrested on an unrelated charge in January 2003, the month before the shooting incident, and had tested positive for cocaine at that time.  "I ought to be able to get into that to impeach her credibility," she argued.  *Id.* at 208.

Over the government's objection, the district court permitted Fonseca's counsel to pursue this line of questioning, within limits.  The court ruled that the inquiry about whether Williams was using drugs on the night before the shooting was directly relevant "to her ability to remember and also [to] her perception of what was occurring at the time."  *Id.* at 209.  Kee-Kee's statement to defense counsel, the court said, was sufficient to establish a good-faith basis for that inquiry.  The

court further ruled, however, that any questioning about Williams' drug test in January 2003 would require "more of a predicate." *Id.* The court said that if Williams testified (as counsel expected) not just that "I don't get high," but that she "wasn't getting high at that time, and . . . wasn't getting high anytime around that time," that would "open the door" to an inquiry about the test results because it would "go to her credibility." *Id.* at 209-10.

Having obtained this favorable ruling, defense counsel made an additional request. She advised the court that the police report of Williams' January 2003 arrest stated that "a crack pipe was recovered from her purse." *Id.* at 210. The court, however, deemed that line of questioning inappropriate.

Fonseca's counsel then resumed the cross-examination, which proceeded as she anticipated it would at the bench conference. Williams testified, "I don't get high." *Id.* at 211. Counsel asked whether Williams meant that she did not smoke crack on the night of the shooting, or that she never smoked crack. Williams responded that she had not "gotten high" since her June 2002 heart attack. *Id.* at 212. Counsel then asked whether Williams recalled testing positive for crack cocaine on January 13, 2003. When Williams said she did not, counsel requested the court's permission to use a police report of Williams' January 11 arrest to refresh her recollection "about having an occasion to test" for drugs two days later. *Id.* at 215. The court granted permission, again over the government's objection. Confronted by the report, which recounted the arrest but did not mention a drug test, Williams said that she recalled the day in question but that she "did not test positive for crack cocaine that day." *Id.*

Williams' response did not end there. Sua sponte, she told defense counsel that "[y]ou cannot discredit me with that arrest

because that was a 'no paper' arrest, and I was out the next day because they found nothing on me." *Id.* at 216. This statement prompted counsel to attempt to cross-examine Williams about the crack pipe with a leading question: "[Y]ou didn't have anything on you this day that you are talking about, this arrest, correct?" *Id.* at 216. When the government objected, the court sustained the objection, stating that the issue was "collateral." *Id.* There was no further discussion at trial or at the bench regarding the crack pipe. During the defendant's case, however, the court admitted into evidence a record of Williams' January 13, 2003 drug test, and it permitted a Pretrial Services toxicologist to testify that Williams tested positive for cocaine on that date.

B

Fonseca insists that the court improperly truncated his counsel's cross-examination by barring questions about Williams' possession of a crack pipe on January 11, 2003, a month prior to the events at issue in this case. Fonseca does not contend that Williams' possession of the crack pipe was itself directly relevant to the shooting. Indeed, he states that the "fact that police officers recovered a crack pipe from Liz'a Williams on January 11, 2003, would not ordinarily have been relevant at appellant's trial." Appellant's Br. at 21. Rather, Fonseca argues that possession of the pipe was made relevant by Williams' statements on cross-examination that she had not smoked crack since 2002 and that "they found nothing on me" when she was arrested in January 2003. Evidence that Williams possessed the pipe was intended to rebut those statements and thus to challenge Williams' credibility. As the district court correctly observed, however, the question of whether Williams possessed a crack pipe in January 2003 was a "collateral" matter, 3/1/04

Tr. at 216, because that incident did not involve the charges against Fonseca.[3]

That evidence concerns a collateral matter does not, of course, necessarily render it inadmissible. To the contrary, such evidence is admissible provided that it is "relevant" and not otherwise prescribed by law or rule. *See* FED. R. EVID. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. And evidence that would contradict Williams' trial testimony, even on a collateral subject, would have such a tendency because it would undermine her credibility as a witness regarding facts of consequence. The technique that defense counsel wished to employ, known as "impeachment by contradiction," is a well-recognized tool for exposing a witness' lack of credibility. *See* WEINSTEIN'S FEDERAL EVIDENCE §§ 607.06[1], 608.20[3][a] (2d ed. 2005) (hereinafter WEINSTEIN'S). And as we have previously noted, "[p]articularly where a party is seeking to impeach a witness whose credibility could have an important influence on the outcome of the trial, the district court should be cautious in limiting cross-examination." *Harbor Ins. Co. v. Schnabel Foundation Co.*, 946 F.2d 930, 935 (D.C. Cir. 1991).

---

[3]*See United States v. Mitchell*, 49 F.3d 769, 780 (D.C. Cir. 1995) (stating that the subject of proposed cross-examination of a government witness -- a challenge to the witness' direct testimony that he did not know that a particular airplane shipment contained cocaine -- "was collateral to the issues at trial" because the defendant "was not charged with th[at] cocaine shipment"); *United States v. Innamorati*, 996 F.2d 456, 479 (1st Cir. 1993) (stating that the "proposed contradiction" of a government witness' testimony that he did not possess cocaine on a certain occasion was "collateral to the main issues in this trial," because the incident "did not in any way involve any of the defendants or the charges against them").

Nonetheless, under Federal Rule of Evidence 403, evidence -- including evidence employed to impeach by contradiction -- "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403; *cf.* FED. R. EVID. 608 advisory committee's notes to 2003 amendments (noting that the amendments "leave[] the admissibility of extrinsic evidence offered for other grounds of impeachment[,] such as contradiction, . . . to rules 402 and 403"); WEINSTEIN'S §§ 607.06[2], 608.20[3][a]. Rule 403 "call[s] for balancing the probative value of and need for the evidence against" the problems identified in the rule. FED. R. EVID. 403 advisory committee's notes to 1972 proposed rules; *see Abel*, 469 U.S. at 54-55; WEINSTEIN'S §§ 607.06[2], 608.20[3][a]. Because evidence regarding collateral matters is more likely to implicate those problems, while being of lesser probative value, trial courts are afforded considerable leeway in deciding whether to admit such evidence. *See United States v. Mitchell*, 49 F.3d 769, 780 (D.C. Cir. 1995); *United States v. Innamorati*, 996 F.2d 456, 479 (1st Cir. 1993); *see generally* WEINSTEIN'S § 403.06[2].

There is no doubt that Williams was a key witness against Fonseca. But the district court did not prevent Fonseca's counsel from challenging her credibility. As we have recounted above, the court permitted defense counsel to ask Williams whether she used drugs shortly before the shooting incident, based solely on a representation of what "Kee-Kee" had told counsel. The court then permitted counsel to expand this inquiry into questions about Williams' drug use a month earlier, because Williams "opened the door" with the statement that she had not used drugs since 2002. Finally, the court permitted counsel to complete the impeachment by admitting the test results and toxicologist's testimony into evidence. *See*

WEINSTEIN'S § 608.20[3][a]; FED. R. EVID. 608 advisory committee's notes to 2003 amendments. In short, the district court provided Fonseca's counsel ample opportunity to cast doubt on Williams' credibility.

This is not to say that a line of cross-examination regarding Williams' possession of a crack pipe would not also have been relevant; it would have been, as it would have further contradicted her claim not to have used drugs since 2002. But in this respect it would only have been cumulative, and weakly so at that. As the court noted, even if Williams had a crack pipe, "the fact that she had it doesn't necessarily mean that she was using it." 3/1/04 Tr. at 210. Although an inference to that effect would certainly have been permissible, it was substantially weaker than the direct evidence that the court permitted Fonseca to introduce: test results showing cocaine in Williams' system in January 2003.[4]

Fonseca's appellate counsel protests that cross-examination regarding the crack pipe was relevant, not merely to contradict Williams' statement that she did not use drugs, but also to contradict her claim that "they found nothing on me" at the time of the January arrest. Although Fonseca's trial counsel did not make this more refined argument at the bench conference (which took place before Williams made the "they found nothing on me" remark), perhaps it could have been inferred from the leading question she attempted to direct at Williams. In any event, while establishing two contradictions may be more persuasive than establishing one, when the contradictions relate

---

[4]*See Mitchell*, 49 F.3d at 779-80 (affirming the district court's decision to deny, as cumulative, the use of a witness' videotaped statements to impeach his testimony on a collateral matter because the court had permitted the defendant to use other material to impeach the witness regarding the same matter).

to collateral matters, the second still remains cumulative as to the fundamental purpose of the exercise: sowing doubt regarding the general credibility of the witness.

Moreover, completing the impeachment regarding the "they found nothing on me" statement posed problems of confusion and delay that were absent from counsel's successful effort to contradict Williams' statement that she had not used drugs at all since 2002. The latter testimony was unambiguous, and it was readily, directly, and powerfully contradicted by the drug test results. The former testimony, by contrast, was ambiguous: in context, the "nothing" Williams referred to could have been drugs rather than drug paraphernalia. Moreover, impeachment would have required more than the police report: the report did not explain how the officer knew the purse belonged to Williams (it was found in an apartment in which she and others were present), nor why he concluded that the pipe deserved the appellation "crack" (the report did not state that drug residue had been found). Although appellate counsel suggested that the police officer who authored the report could have been called to testify, there was no proffer that he was available or that counsel knew what he would say. Going down this road, then, would have led to both delay and a "mini-trial" on a collateral matter, two of the problems that Rule 403 seeks to avoid. *See United States v. Baylor*, 97 F.3d 542, 545 (D.C. Cir. 1996).[5]

---

[5]The case of *United States v. Innamorati*, 996 F.2d at 479-80, presents a fact situation similar to that presented here. In *Innamorati*, a cooperating government witness testified that he did not have cocaine in his possession during an incident in which he was arrested by local police -- an incident that occurred during the period of his cooperation with the DEA. The defendants wanted to call the arresting officers to testify that the witness did in fact possess cocaine on that occasion. Such testimony would have shown that the witness continued to use cocaine after he began cooperating with the DEA,

15

In support of his contention that the district court abused its discretion by disallowing the proffered cross-examination, Fonseca cites this court's decision in *United States v. Bell*, 506 F.2d 207 (D.C. Cir. 1974). In *Bell*, a defendant charged with narcotics offenses claimed during cross-examination that he had never seen narcotics except on television. To contradict that statement, the district court permitted a police officer to testify that he had watched the defendant conduct a drug transaction a few days before his arrest in the case at bar. We affirmed the defendant's conviction, holding that the district court had not abused its discretion by permitting the testimony. *See id.* at 212-15.

There is no inconsistency between our ruling in this case and our ruling in *Bell*. In the latter, we held that it was permissible for the district court to admit the requested impeachment; we did not suggest that it would have been error for the court to exclude it. Here, too, it would have been permissible for the district court to allow defense counsel to impeach the witness regarding the crack pipe. We hold only that the court did not abuse its discretion by barring the impeachment. The different outcomes reflect nothing more than the nature of an "abuse of discretion" standard of review. Where, as here, two different evidentiary rulings would be

---

rebutting his testimony to the contrary. It also would have directly contradicted the witness' specific assertion that he did not have cocaine in his possession at the time of the arrest. Nonetheless, the First Circuit affirmed the trial court's exclusion of the evidence. As Judge Boudin explained: "[T]he district court was justified in preventing a major detour" into the incident because the evidence was "collateral," and the witness "admitted on cross-examination that he had used cocaine long after he began cooperating," thus rendering the incident "at best cumulative evidence." *Id.*

reasonable, the standard leaves the choice to the discretion of the trial judge.

In sum, we reject Fonseca's contention that his counsel "was hamstrung" by limitations on cross-examination that prevented counsel from "challeng[ing] the honesty and credibility that Ms. Williams so doggedly asserted." Appellant's Br. at 24. To the contrary, the court permitted counsel to forcefully challenge Williams' credibility on cross-examination and then to introduce extrinsic evidence to complete the impeachment.[6] Because it is reasonable to conclude that the probative value of the additional cross-examination sought by the defense was marginal and substantially outweighed by the factors identified in Rule 403, the district court's ruling did not constitute an abuse of discretion.

IV

For the foregoing reasons, we affirm both the district court's denial of Fonseca's Speedy Trial Act motion and its evidentiary ruling regarding the scope of cross-examination. As discussed in footnote 1 above, we accept both parties' suggestion that we remand the record to the district court for the limited purpose of "determin[ing] whether it would have imposed a different sentence, materially more favorable to the defendant, if sentencing had taken place under the post-*Booker* sentencing regime." *United States v. Coles*, 403 F.3d 764, 765 (D.C. Cir. 2005) (referencing *United States v. Booker*, 543 U.S.

---

[6]This case is therefore unlike *United States v. Whitmore*, in which we reversed a conviction because "the court deprived [the defendant] of any realistic opportunity to challenge the credibility of the only witness who testified that [he] committed the firearm offense." 359 F.3d 609, 612 (D.C. Cir. 2004).

220 (2005)); *see United States v. Gomez*, 431 F.3d 818, 822-23 (D.C. Cir. 2005).

*So ordered.*